42 A.3d 1265 (2012)
STATE
v.
Shurron WASHINGTON.
No. 2010-408-M.P.
Supreme Court of Rhode Island.
May 17, 2012.
Virginia M. McGinn, Department of Attorney General, for State.
*1266 Lara E. Montecalvo, Office of the Public Defender, for Defendant.
Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

OPINION
Justice ROBINSON, for the Court.
The defendant, Shurron Washington, appears before this Court pursuant to our having granted his petition for a writ of certiorari;[1] he seeks review of an adjudication of a probation violation after a hearing that took place on May 6 and 7, 2009. At the conclusion of that hearing, the hearing justice found that defendant had violated the terms and conditions of his probation, and the hearing justice revoked the suspension of a ten-year sentence that had previously been meted out.
On appeal, defendant contends that the hearing justice erred in adjudicating him to be a probation violator because, in defendant's view, the record in this case raises "too many questions" about the reliability of the identification of him as the perpetrator of the alleged attack that is described hereinafter.
This case came before the Supreme Court for oral argument pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After reviewing the record and considering the written and oral submissions of the parties, we are satisfied that cause has not been shown and that this appeal may be resolved without further briefing or argument.
For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

I

Facts and Travel
On January 10, 2005, defendant, having pled nolo contendere to one count of assault with intent to commit certain specified felonies, was sentenced to fifteen years imprisonment; he was ordered to serve five years, with the balance suspended for a ten-year probationary period.[2] When the events at issue in this case occurred, defendant was still on probation.
On March 27, 2009, defendant was arrested as a result of a criminal complaint which alleged that the following two offenses occurred on March 18, 2009:(1) felony assault with a dangerous weapon in violation of G.L.1956 § 11-5-2;[3] and (2) assault with the intent of committing a specified felony (viz., sexual assault) in violation of § 11-5-1.[4]
*1267 On March 30, 2009, the state filed a violation report pursuant to Rule 32(f) of the Superior Court Rules of Criminal Procedure.[5] The hearing concerning the alleged probation violation was held on May 6 and 7, 2009. It is what transpired at that hearing that is the focus of this opinion.
At the probation violation hearing, the state presented several exhibits and the following witnesses: Carrie Banner[6] (the complaining witness); Joanne O'Neill Kane (a fact witness); and Christopher Tuffy (a detective lieutenant in the Lincoln Police Department). The defendant also presented a number of exhibits and the following witnesses: John Howell (defendant's grandfather), Nyree Washington (defendant's wife), and Lillie Howell (defendant's grandmother).[7] The defendant also testified on his own behalf.
Carrie Banner, a college student who was then twenty-three years old, testified at the probation violation hearing that, on March 18, 2009[8] at approximately 10:15 a.m., she went to the campus of the Community College of Rhode Island (CCRI) in Lincoln in order to inquire about its nursing program. Ms. Banner further testified that, as she was walking to an office in the building at CCRI, she noticed in her peripheral vision an individual, whom she later described as being male and wearing "a big black jacket," which was "puffy, like [a] down jacket" and which went down to his knees, or just above them. She stated that she noticed that man because "the jacket was abnormal for the weather * * * [on] that day" and also because "the person was kind of skinny and the jacket was huge."
Ms. Banner proceeded to testify that, after meeting with an instructor at CCRI, she prepared to go home. She stated that she walked down a hallway and through two sets of doors, so that she could leave the building. She testified that, just as she "was about to walk upstairs" in order to reach her car, she "heard steps running behind [her];" she stated that a man then "grabbed" her. Ms. Banner testified that, when that man grabbed her, he "put [his] hand over [her] neck * * * with a knife;" she added that at one point her "mouth was covered." Ms. Banner further testified that the man said to her: "If you yell, I'm going to kill you." Ms. Banner added that the man told her to turn around and to walk from the stairwell area back into the building itself; she stated that the man then pushed her into a women's bathroom.
Ms. Banner testified that, once they were in the women's bathroom, the man told her to take her shirt off; she stated that she spoke to him through his hands which were covering her mouth and said: "[H]ow can I do [that] when my jacket is *1268 on?" It was Ms. Banner's further testimony that, at that point in time, her assailant began to cut her on her chin, lips, and cheeks. Ms. Banner further testified that, after a "wrestle point"[9] was reached, she asked her attacker: "Why are you doing this to me? * * * Do you have a mother and you probably have a sister, so why are you doing this to me?" She stated that, after she posed those questions, the man "looked confused and he said he was sorry and that's when he unlocked the door and ran."
Ms. Banner testified that the man who she said had attacked her at CCRI was someone whom she had never before seen; she described him as being "[a] lighter-skinned black male" with a "broader nose;" she added that "he had cornrows [and was] skinny [and] about 5'8"." She further testified that, on March 26, 2009 at the Lincoln Police Department, she viewed over one hundred photographs; she added that, after viewing the photographs, she identified defendant as the perpetrator of the attack on her at CCRI. (The photograph of defendant that Ms. Banner identified at the police station on March 26 was entered as a full exhibit at the probation violation hearing.) Ms. Banner further testified at the hearing that, in the photograph that she viewed on March 26, defendant's appearance was different from what it had been on March 18because, on March 18 (the date of the alleged incident at CCRI), he had been wearing his hair in cornrows, whereas he was not wearing his hair in that manner in the photograph that she identified on March 26. In addition, during the probation violation hearing, Ms. Banner made an in-court identification of defendant as her alleged attacker.
Joanne O'Neill Kane, an enrollment services representative at the Lincoln campus of CCRI, also testified at the hearing. Ms. Kane stated that she is employed at the enrollment services counter, where she deals with students on a daily basis. Ms. Kane testified that, on March 18, while she was working at the enrollment counter, she assisted an African-American male, who was five-foot nine or five-foot ten in height, was in his early 20s, and had his hair styled with cornrows or braids. She stated that she asked him whether he needed any help. According to Ms. Kane, the man responded that he was thinking about coming back to school; she then gave him a catalogue and some additional information. Ms. Kane stated that she did not recall having had any further interaction with the man. Ms. Kane testified that, after the alleged March 18 incident, she met with the Lincoln police for the purpose of viewing a photo lineup; she added that she picked out defendant's photograph as being the man with whom she briefly spoke on March 18. That particular photograph as well as the photo lineup from which it was selected by Ms. Kane were entered as full exhibits at the hearing. Ms. Kane also made an in-court identification of defendant during the probation violation hearing.
The state also presented as a witness Christopher J. Tuffy, a detective lieutenant in the Lincoln Police Department. Detective Tuffy testified that, at the time when he was assigned to investigate the alleged March 18 incident, there were no suspects in the case. The detective stated that, on the basis of information provided to the police by the complaining witness, he proceeded to obtain 134 photographs from the Adult Correctional Institutions database. Detective Tuffy testified that he asked Carrie Banner to view those photographs *1269 on March 26; he stated that, as she was in the process of viewing the photographs, she "stopped" when she came upon defendant's photograph and told the detective that "that was him, but his hair style was different in the photo[graph]." Detective Tuffy testified that, after Ms. Banner identified defendant, she continued viewing the photographs; he added that she then returned to the photograph of defendant and "stayed with him as the person that assaulted [her]."
Detective Tuffy further stated that he thereafter obtained a more recent photograph of defendant from the Woonsocket Police Department, in which photograph defendant was wearing his hair in cornrows. He testified that he employed that photograph in a photo lineup, which consisted of six photographs. The detective stated that he showed that lineup to Ms. Kane and that she identified defendant. Detective Tuffy testified that he subsequently showed that photo lineup to Ms. Banner and that she also picked out defendant from that lineup.
Detective Tuffy stated that, on March 27, based on those two identifications, the Lincoln Police Department obtained an arrest warrant for defendant and took him into custody. The detective testified that defendant (who was advised of his rights and agreed to speak with the police) denied the allegations against him. Detective Tuffy added that defendant did admit to owning a "big black jacket" and to having visited CCRIalthough he said that he could not remember the exact date of his visit to CCRI.
The defendant testified on his own behalf at the hearing. It was his testimony that, on March 18, his grandmother had driven him to meet with his probation officer at approximately 9 a.m. (He stated that his own car was being repaired on that date.) He further testified that he had remained with his probation officer for about fifteen to twenty minutes before returning home and spending the rest of his day there with his daughter while also doing laundry. The defendant proceeded to testify that, when he was placed under arrest on March 27, he told the police that he had been to CCRI in the recent past, but that he could not remember exactly when. At the probation violation hearing, however, he testified that he was able to remember that it was on March 20 that he went to CCRI; he added that his grandfather had accompanied him to the CCRI campus on that day. The defendant further testified that his grandfather had remained in the car while he went into CCRI for about half an hour to inquire about re-enrollment.
The defendant testified that, while at CCRI on March 20, he never dealt with Ms. Kane and that he had never seen her prior to the day of the probation violation hearing. He proceeded to testify that the woman whom he did in fact meet at CCRI wrote down his Social Security number, as well as "the number in the AW."[10] According to defendant, he remained at CCRI for about half an hour and then went with his grandfather to get his hair cut. The defendant additionally testified that he does not own a black puffy knee-length jacket and that he never told the Lincoln police that he does own one. The defendant testified that the only black jacket that he owned is a jacket with money symbols on it. (The just-referenced jacket was admitted into evidence as a full exhibit.)
*1270 The defendant's grandfather, John Howell, also testified at the hearing. He testified that on March 20 he drove with defendant to CCRI so that defendant could register for classes. Mr. Howell testified that he waited in the car for defendant for an hour and a half and that they then left CCRI, at which time he accompanied defendant as he went to get a haircut.
At the hearing, the defense also presented testimony from defendant's wife, Nyree Washington. She testified that she remembered that defendant went to register for classes at CCRI on March 20. Ms. Washington further testified that defendant does not own a black puffy jacket, but only a jacket with "dollar signs" on it.
The defendant's grandmother, Lillie Howell, also testified on behalf of defendant at the hearing. Ms. Howell testified that on March 18 she took defendant to register with the Woonsocket police and to see his probation officer. She stated that they left that meeting at approximately 10:30 or 11 a.m. Ms. Howell further stated that, in spite of the fact that defendant's car was being repaired, she would not allow him to use her car. Ms. Howell further testified that she remembered that defendant had gone to CCRI on March 20 with his grandfather while she stayed at home. Ms. Howell also stated that defendant does not own a long black puffy jacket and that, in March of 2009, he was wearing the jacket with the dollar signs on it that was admitted into evidence.
Before rendering his decision, the trial justice reviewed the evidence and the testimony of the witnesses and the other evidence that had been presented. After reviewing the evidence, the hearing justice stated that the testimony of Carrie Banner, the complaining witness, was "extremely consistent," and he added that "everything that she said seemed to be backed up." The hearing justice elaborated that Ms. Banner had identified defendant in two different photographs and had also identified him in court; the hearing justice also noted that Ms. Banner had described the site where the incident occurred and had also described the knife wielded by her attacker and the cuts inflicted on her by that knife.
The hearing justice also found that "the woman from CCRI [Ms. Kane]" did not have "any axe to grind." He stated that Ms. Kane not only recalled the day that defendant was at CCRI, but also that she had "clearly identified" defendant from the photo array.
In summary, the hearing justice found the witnesses for the prosecution to be credible, whereas he said that "at best [defendant's] family's testimony was confused." The hearing justice stated that "[t]he witnesses that testified for the defense clearly had a reason for doing what they did;" he said that they were "rallying around [defendant] to try to prevent him from going back to jail." The hearing justice found that it was very plausible that defendant could have slipped out of the house on March 18, without anyone knowing. The hearing justice stated that he was satisfied that defendant was at CCRI on March 18.
With respect to the black puffy jacket, the hearing justice stated that "it doesn't take a rocket scientist to figure out that if you flip [the jacket with dollar signs on it] around and turn it inside out, that it's a black, puffy coat," just as Ms. Banner described.
In light of his findings, the hearing justice found that the state had met its burden and had demonstrated that defendant "in fact did violate the terms of his probation." He therefore adjudicated defendant to be a probation violator, and he proceeded to hear argument with respect to sentencing. The hearing justice then ordered defendant to serve his previously imposed *1271 suspended ten-year sentence. Thereafter, defendant filed a petition for a writ of certiorari, which was granted by this Court. (See footnote 1, supra.)
Before this Court, defendant contends that the record in this case "raises too many questions" with respect to the reliability of the identification of defendant as the perpetrator of the March 18 incident. He specifically avers that the hearing justice's reliance upon Ms. Banner's eyewitness identification was misplaced and that, therefore, the hearing justice erred in adjudicating him to be a probation violator.

II

Standard of Review
The only issue for a hearing justice to consider at a probation violation hearing is "whether or not the defendant has breached a condition of his or her probation by failing to keep the peace or remain on good behavior." State v. Christodal, 946 A.2d 811, 816 (R.I.2008); see also State v. Lancellotta, 35 A.3d 863, 867 (R.I.2012); State v. Shepard, 33 A.3d 158, 163 (R.I.2011). Additionally, "[t]he burden of proof on the state at a probation violation hearing is much lower than that which exists in a criminal trial-the state need only show that reasonably satisfactory evidence supports a finding that the defendant has violated his or her probation." State v. Horton, 971 A.2d 606, 610 (R.I. 2009) (internal quotation marks omitted); see also State v. Tetreault, 973 A.2d 489, 491-92 (R.I.2009); State v. Bouffard, 945 A.2d 305, 310 (R.I.2008).
In determining whether or not a defendant has committed a violation of his or her probation, "the hearing justice is charged with weighing the evidence and assessing the credibility of the witnesses." Christodal, 946 A.2d at 816; see also State v. English, 21 A.3d 403, 407 (R.I.2011); State v. Gauthier, 15 A.3d 1004, 1007 (R.I. 2011). This Court accords deference to "the assessment of the credibility of witnesses made by a judicial officer who has had the opportunity to listen to live testimony and to observe demeanor." Horton, 971 A.2d at 610.
Our review of a finding of a probation violation by the nisi prius court is limited to determining "whether the hearing justice acted arbitrarily or capriciously in assessing the credibility of the witnesses or in finding such a violation." Tetreault, 973 A.2d at 492 (internal quotation marks omitted); see also Shepard, 33 A.3d at 163; State v. Sylvia, 871 A.2d 954, 957 (R.I. 2005).

III

Analysis
The defendant contends that the hearing justice acted arbitrarily and capriciously when he found defendant to be in violation of the terms and conditions of his probation; the basis for that contention is the fact that the hearing justice relied on eyewitness testimonywhich, defendant argues, was not reliable.
In our review of an adjudication of a probation violation, we accord "considerable deference to the reliability and credibility determinations made by the trial justice at a probation violation hearing." State v. Jensen, 40 A.3d 771, 780 (R.I. 2012); see also State v. Seamans, 935 A.2d 618, 624 (R.I.2007) ("It is not ordinarily the role of this Court to second-guess credibility assessments in a probation violation hearing."). That deference is premised upon our realization that we lack "the same vantage point as the presiding judge, and we are unable to assess the witness' demeanor, tone of voice, and body language. Our perspective is limited to analyzing words printed on a black and white record." Jensen, 40 A.3d at 780 (internal quotation marks omitted); see also State v. DiCarlo, 987 A.2d 867, 872 (R.I.2010) (stating that "[t]his Court affords a great deal *1272 of respect to the factual determinations and credibility assessments made by the judicial officer who has actually observed the human drama that is part and parcel of every trial and who has had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record" (internal quotation marks omitted)).
As a result, in our analysis with respect to a credibility determination in the context of a probation violation, we have stated as follows:
"When * * * an inquiry as to whether defendant [has] violated his probation turns on a determination of credibility, and after considering all the evidence, the hearing justice accepts one version of events for plausible reasons stated and rationally rejects another version, this Court can safely conclude that the hearing justice did not act unreasonably or arbitrarily in finding that a probation violation has occurred." Shepard, 33 A.3d at 164 (internal quotation marks omitted); see also State v. Ferrara, 883 A.2d 1140, 1144 (R.I.2005).
In the instant case, the complaining witness, Carrie Banner, not only described with a significant degree of preciseness the events of March 18 and the places on the CCRI campus where she said that those events had taken place, but she also identified defendant's photograph from over 134 photographseven though defendant was pictured in that photograph wearing a hairstyle that differed from the hairstyle of her attacker on the day of the attack. Ms. Banner also identified defendant from a photo lineup with the hairstyle that he was wearing in March of 2009. In addition, Joanne O'Neill Kane also identified defendant from a photo lineup.[11]
In contrast to the testimony of the eyewitnesses, the hearing justice found the testimony of the family members testifying for defendant to be "at best * * * confused." The hearing justice further recognized that, despite the testimony of defendant's family as to his whereabouts on March 18, it was "very possible" that defendant could have been able to "slip out" and find his way to CCRI on that day. The hearing justice additionally noted that the jacket with the dollar bill signs presented by defendant could be turned inside out so as to become a black puffy jacket similar to the jacket which Ms. Banner remembered her attacker to have been wearing on March 18.
After carefully reviewing the entire record, it is evident that the hearing justice had more than plausible reasons for accepting the complaining witness's testimony and identification and for rejecting the defendant's version of events. See Shepard, 33 A.3d at 164. In our judgment, the hearing justice's detailed findings as to the testimony and evidence presented at the hearing were more than sufficient to constitute *1273 a basis for a determination that the defendant did not keep the peace and was not of good behavior. In fine, we are fully satisfied that the hearing justice did not act arbitrarily or capriciously when he declared that the defendant had violated the terms and conditions of his probation.

IV

Conclusion
For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record in this case may be returned to that tribunal.
Justice INDEGLIA did not participate.
NOTES
[1] With respect to the petition for a writ of certiorari in this case, the record reveals that "[f]or some reason, a notice of appeal was not filed in a timely fashion. (Mr. Washington was represented at the violation hearing by private counsel.)" The defendant's petition for a writ of certiorari was filed by a public defender. This Court subsequently granted said petition. See, e.g., State v. Shepard, 33 A.3d 158, 162-63 (R.I.2011); State v. Gauthier, 15 A.3d 1004, 1007 (R.I.2011).
[2] As a result of the 2005 conviction, defendant was also ordered to attend sex-offender counseling and to register as a sex offender.
[3] General Laws 1956 § 11-5-2 provides in pertinent part as follows:

"(a) Every person who shall make an assault or battery, or both, with a dangerous weapon, or with acid or other dangerous substance, or by fire, or an assault or battery which results in serious bodily injury, shall be punished by imprisonment for not more than twenty (20) years."
[4] Section 11-5-1 provides as follows:

"Every person who shall make an assault with intent to commit murder, robbery, sexual assault, burglary, or the abominable and detestable crime against nature, shall be imprisoned not exceeding twenty (20) years nor less than one year."
[5] Rule 32(f) of the Superior Court Rules of Criminal Procedure reads as follows:

"The court shall not revoke probation or revoke a suspension of sentence or impose a sentence previously deferred except after a hearing at which the defendant shall be afforded the opportunity to be present and apprised of the grounds on which such action is proposed. The defendant may be admitted to bail pending such hearing. Prior to the hearing the State shall furnish the defendant and the court with a written statement specifying the grounds upon which action is sought under this subdivision."
[6] We refer to the complaining witness by a pseudonym in order to protect her privacy.
[7] In the record, defendant refers to his grandmother as his mother; however, for the sake of simplicity and clarity, we will refer to her as his grandmother.
[8] In view of the fact that the alleged March 18, 2009 incident in Lincoln that is at issue in this case as well as the resultant investigation and probation violation hearing all occurred in the year 2009, we shall hereinafter generally refrain from needlessly reciting the year.
[9] Ms. Banner stated that, by the term "wrestle point," which is quoted in the text, she meant the following: "He was behind me and so he had me in like a, trying to push me to the ground, but he could not."
[10] During his cross-examination of Ms. Kane, defense counsel presented her with a note that had certain markings on it; Ms. Kane testified that she did not recognize that note, but she explained that the letters on the note (viz., "AW") meant "Academic Warning" and that the numbers on the note constituted a college ID number. Ms. Kane testified that the markings on the note were not in her handwriting.
[11] We have carefully considered defendant's argument based on research by social scientists as to eyewitness testimony sometimes being unreliable in spite of the witness's confidence in his or her identification. In this case, however, the hearing justice specifically determined the multiple identifications of defendant to be reliable, and our review of the record has not yielded any reason to question that determination.

It should be noted that defendant "does not contend that the identification procedure utilized in identifying him was suggestive and therefore of questionable constitutional validity." See State v. Jensen, 40 A.3d 771, 780 (R.I.2012). As a result, "we need not evaluate the reliability of that identification procedure from a constitutional perspective." Id.; see Perry v. New Hampshire, ___ U.S. ___, ___, 132 S.Ct. 716, 730, 181 L.Ed.2d 694 (2012) ("[W]e hold that the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement.").