December 8, 2017

Supreme Court

No. 2016-11-C.A.

(P2/10-3252A)

State                              :

    v.                             :

Thomas Mosley.                     :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                           :

v.                               :

Thomas Mosley.            :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Robinson for the Court.** The defendant, Thomas Mosley, seeks review of an adjudication of probation violation after a hearing on September 30 and October 1, 2015 in Providence County Superior Court. Finding that the defendant had violated the terms and conditions of his probation, the hearing justice ordered him to serve at the Adult Correctional Institutions (ACI) six of the seven years of his previously suspended sentence. On appeal, the defendant contends that the hearing justice acted arbitrarily and capriciously in adjudicating him to be a probation violator because, in defendant's view, the record in this case does not substantiate the finding that he failed to keep the peace or remain on good behavior when he made certain statements in the course of telephone calls from the prison, where he had been detained prior to the probation-violation hearing. This case came before the Supreme Court for oral argument pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After a close review of the record and careful consideration of the parties' arguments (both written and oral), we are satisfied that cause has not been shown and that this appeal may be decided at this time.

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

On October 26, 2010, defendant, having pled *nolo contendere* to possession of a controlled substance with intent to deliver, was sentenced to eight years imprisonment with one year to serve and seven years suspended with probation. When the events at issue in this case occurred, defendant was still on probation for that offense.

On July 8, 2015, the state filed a probation-violation report pursuant to Rule 32(f) of the Superior Court Rules of Criminal Procedure, alleging that defendant had violated the terms and conditions of his probationary sentence; that report resulted from the fact that defendant had been charged with the murder of one Yusef A'Vant. Thereafter, on September 22, 2015, the state filed a second probation-violation report, alleging that defendant had been charged with obstruction of the judicial system while making certain phone calls from the ACI between September 6 and September 10, 2015 and further alleging that that conduct constituted a violation of the terms and conditions of his probationary sentence.[1] The defendant was presented as a probation violator in the Superior Court; and, on September 30 and October 1, 2015, the hearing justice conducted a combined probation-violation and bail hearing, at the conclusion of which she adjudged defendant to be a violator and ordered him to serve six of the seven years of his suspended sentence.

In order to address defendant's contentions on appeal, it is necessary to consider the contents of certain phone calls that he made from the ACI, which formed the focus of the hearing

---

[1]     The criminal complaint charging defendant with murder was dismissed on January 11, 2016, pursuant to G.L. 1956 § 12-13-6, and the charge for obstruction of the judicial system was dismissed on September 7, 2016, pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure. However, on August 26, 2016, defendant was again charged with both crimes pursuant to a grand jury indictment. The murder indictment remains pending.

justice's determination that defendant had "failed to keep the peace and be of good behavior." According to the transcript of the audio recordings of the phone calls, defendant made two calls from the ACI on September 8, 2015.[2] Said transcript reveals that defendant repeatedly made reference to a person called "she" or "her;" it is undisputed that, when defendant alluded to "she" or "her" in those calls, he was referencing one Rithy Suon, who was the mother of his child and a key witness in the state's then-pending case against him for the murder of Mr. A'Vant.

## A

## The First Phone Call

At the beginning of the first phone call, defendant asked the person with whom he was speaking (the First Speaker) to "[t]ake this number down" and "call her job for me." The defendant explained to the First Speaker that, "if you call her work number and you asked to speak to her, they will put her on the phone with you right away." The First Speaker agreed to reach out to Ms. Suon. The defendant thereafter told the First Speaker that "somebody is telling her not to pick up my calls from jail," and he asked the First Speaker to convince Ms. Suon to visit defendant and start accepting his calls. The defendant asked the First Speaker to

> "explain to her, the best way that you can, that she needs to come up here to see me. That she needs to come here and talk to me. You know what I'm saying? That all of this is between me and her. You know what I am saying? That she needs to come up here and talk to me and stopping talking to -- or stop listening to anybody else. You know what I'm saying?"

---

[2]     The transcript of the phone calls at issue does not indicate the time or date of the calls; however, in his statement filed pursuant to Article I, Rule 12A of the Supreme Court Rules of Appellate Procedure, defendant acknowledged that the first call was made on September 8, 2015 at 1:31 p.m. and that the second was made on that same date at 1:43 p.m.

Additionally, as indicated in the transcript of the phone calls, each of defendant's calls from the ACI was preceded by an automated message warning that the call would be "monitored or recorded."

The defendant also instructed the First Speaker to encourage other people to reach out to Ms. Suon on his behalf, explaining: "Have everybody call her to try to convince her to come see me and talk to me * * *." The defendant expressed his belief that Ms. Suon could be persuaded to "be on his side" because he was the father of her child, telling the First Speaker:

> "If you all got in contact with her and told her, like, look, you need to be on his side. You know what I'm saying? Don't leave him. Don't leave his side. You know what I am saying? Like this -- explain to her, like, this is your kid's father. If anything happens to him, you know what I'm saying; your kid is without a father."

The defendant also expressed his belief that Ms. Suon's previous statements to the police were the result of intimidation or fear that the police might "take away her son;" defendant told the First Speaker that Ms. Suon needed to revise the statements she had previously made to the police and explain "what really happened." Specifically, defendant stated:

> "They're trying to use my kid's mom as a witness against me, so she needs to come. Get her own lawyer. You know what I am saying? And tell her lawyer what really -- what really happened, is that they scared her. You know what I am saying? * * * And now, she is -- they scared her by telling her that they was going to arrest her and take away her son. You know what I'm saying? So now, she needs to tell them, you know, why she said all of this stuff was because they scared her."

The defendant then discussed his son, telling the First Speaker that "she knows how much my son means to me" and "I don't know why she would just be holding my son back from seeing me or me talking to my son or anything like that." Finally, before ending the call, defendant said to the First Speaker:

> "[T]ell her, look, she's safe if she does the right thing. You know what I am saying? She's okay. She doesn't have to be scared of these people. You know what I am saying?"

# B

## The Second Phone Call

In the second phone call, defendant spoke with the person to whom we shall refer as "the Second Speaker,"[3] stating: "I need you to call this girl, ma. She is (inaudible) dirty, ma. I need you to talk to her, please." The defendant further explained:

> "They're putting stuff in her head. She's saying stuff just to please them, ma. You know what I am saying? They are scaring her. They threatened to lock her up. They threatened to take away my son. They're scaring her, ma. I need you to call her and talk to her."

The Second Speaker responded: "I need her number, because she needs to shut her face and just sit tight." The defendant then proceeded to give the Second Speaker the telephone number for Ms. Suon's workplace.

When the Second Speaker asked defendant if Ms. Suon had visited him at the ACI, defendant explained:

> "[S]he came to visit me and brought my son a couple of times, but she stopped coming. Me and her got into a argument. She stopped coming and she started talking to this prosecutor, ma."

The defendant then repeated his request that the Second Speaker call Ms. Suon:

> "Call her. Tell her, ma, she needs to stop doing what she's doing to me. She needs to stop talking to who she's talking to. She needs to -- she needs to get her own lawyer. Tell her that she needs to come up here and see me, man. I haven't seen my son, ma, in almost a month."

The defendant continued discussing his son, explaining, "I love my son, just as much * * * just as much as she loves my son;" and he expressed his view that "somebody is telling her not to

---

[3] The record reflects that the second phone call included conversations between defendant and three separate persons; however, the conversations with the first two persons were brief and perfunctory and are not germane to this case. Accordingly, for the purposes of this opinion, "the Second Speaker" refers to the last person with whom defendant spoke in the second call.

come see me. Somebody is telling her not to pick up my phone calls." The defendant implored the Second Speaker to convince Ms. Suon to visit him in person at the prison:

> "She has to come up here and see me, ma. Please convince her to come up here and see me. She has to come up here and see me. She has to come up here and talk to me. She has to bring my son up here to see me. * * * Please, ma, I need her to stop doing what she is doing."

Before ending the call, defendant again asked the Second Speaker to call Ms. Suon at work, stating: "[C]all her job. Call her job and talk to her. Ask for her name. Ask for Rithy Suon, ma."

## C

### Rithy Suon's Testimony[4]

Ms. Suon testified at the probation-violation hearing that, on the day after defendant's arrest, she had spoken with police officers and told them about certain incriminating statements that defendant had allegedly made to her. Ms. Suon stated that defendant had once admitted to "accidentally kill[ing] somebody." She added that he had allegedly told her that "he exchanged some words between him and that person, and things kind of got out of hand, and [defendant] shot him accidentally."

Ms. Suon also recounted other statements which she had made to the police after defendant's arrest, including her disclosure of a statement that defendant allegedly made when he showed her a picture of a police sketch that had been published in connection with Mr. A'Vant's murder, at which time he asked Ms. Suon whether she thought it looked like him. Ms. Suon

---

[4] It should be borne in mind that Ms. Suon was a key witness in the state's then-pending case against defendant for the murder of Yusef A'Vant. The hearing justice noted that Ms. Suon had made statements to the police shortly after defendant's arrest for the murder of Mr. A'Vant on July 8, 2015, and the hearing justice observed that those statements "supported * * * the homicide investigation." Furthermore, in its argument at the probation-violation hearing, the state explained that, in its view, defendant's phone calls from the ACI demonstrated that "the defendant [was] seeking to obstruct a homicide investigation."

- 6 -

testified:  "I asked him why he had asked me that, and he just told me that it was supposed to look like him.  That was supposed to be him."  Additionally, Ms. Suon testified that defendant had become "really upset" during an unrelated argument and had allegedly told her "'[y]ou don't know what I'm -- I'm about * * * I'm all about the streets. I'm capable of killing someone.'"  Ms. Suon also testified that she had previously provided all of this information to the police over the course of several interviews within three days of defendant's arrest for the murder of Mr. A'Vant.

## D

### The Hearing Justice's Decision

The hearing justice acknowledged that Ms. Suon was the mother of defendant's young child and also acknowledged that the transcript of defendant's telephone calls included several statements in which he expressed a desire to see his son. Nonetheless, the hearing justice found that defendant had made those phone calls from the ACI with the intent to influence or have others influence the behavior and statements of a witness.[5] In so holding, the hearing justice observed that Ms. Suon was a "highly credible" witness, and she concluded that defendant's purported motivation for trying to have others contact Ms. Suon—his desire to see his son—was not persuasive.  The hearing justice rejected defendant's argument that the purpose of the phone calls was to encourage Ms. Suon to bring their child to the ACI for a visit, stating:

> "This argument makes no sense in light of the substance of the phone calls, that would be the totality of the phone calls.  Although the Court recognizes that statements on the tape include, 'I've

---

[5]   Because the hearing justice found defendant to be a violator based on the charge of obstruction of justice, she declined to address the possible probation consequences stemming from the murder charge, stating:  "There is no need to address the second violation since the [c]ourt has just ruled.  It is entirely appropriate for a judge to decline to pass on legal issues that are not pertinent to his or her discretion. * * * For this reason and for judicial economy, the [c]ourt will decline to reach a decision on the violation relative to the homicide."

never been away from my son this long,' the tape also includes statements such as, 'You need to convince her to see me alone.' The tapes do not depict to this Court a loving father desiring to visit with the child. The contrary."[6]

The hearing justice found that defendant's phone calls, taken in their totality, constituted "the worst type of behavior." She considered the placing of those calls to be "an attempt to influence or have influenced this witness, Rithy." She thus concluded that defendant's conduct constituted a "failure to keep the peace and be of good behavior;" she stated:

"This defendant agreed to keep the peace and be of good behavior, and I'm reasonably satisfied that he did not do so. And it's alleged that - - rather than let our justice system unfold, it's alleged that he chose to quiet a witness. That's the allegation."

Having found defendant to be a violator, the hearing justice ordered him to serve six of the seven years of his suspended sentence.

## II

## Analysis

## A

## Finding of Probation Violation

At a probation-violation hearing, the state bears the burden of proving, to the "reasonable satisfaction" of the hearing justice, that defendant breached a condition of his probation by failing to keep the peace or remain on good behavior. *State v. Sylvia*, 871 A.2d 954, 957 (R.I. 2005) (internal quotation marks omitted). It is a basic principle that "the sole purpose of a probation violation hearing is for the trial justice to determine whether the conditions of probation—[k]eeping the peace and remaining on good behavior—have been violated." *State v.*

---

[6]  In his 12A statement before this Court, defendant challenges the accuracy of the hearing justice's comment that defendant asked to see Ms. Suon "alone." In our view, this fact is not material to the disposition of this appeal because the hearing justice expressly noted that her decision was based on the "totality of the phone calls."

*Hazard*, 68 A.3d 479, 499 (R.I. 2013) (internal quotation marks omitted). In determining whether or not a defendant has violated a condition of his probation, the hearing justice is called upon to weigh the evidence and assess the credibility of the witnesses. *See State v. Washington*, 42 A.3d 1265, 1271 (R.I. 2012); *State v. Gauthier*, 15 A.3d 1004, 1007 (R.I. 2011). And we are ever mindful that "[a]ssessing the credibility of a witness in a probation violation hearing is a function of the hearing justice, not this Court." *State v. Gromkiewicz*, 43 A.3d 45, 49 (R.I. 2012) (internal quotation marks omitted). The deference that we accord to the credibility assessments of the *nisi prius* court at a probation violation hearing "is premised upon our realization that we lack the same vantage point as the presiding judge, and we are unable to assess the witness' demeanor, tone of voice, and body language." *Washington*, 42 A.3d at 1271 (internal quotation marks omitted). We will not conclude that a hearing justice has acted unreasonably or arbitrarily in finding a probation violation if, "after considering all the evidence, [he or she] accepts one version of events for plausible reasons stated and rationally rejects another version * * *." *State v. Bouffard*, 945 A.2d 305, 311 (R.I. 2008) (internal quotation marks omitted). Our review of a hearing justice's finding of a probation violation is limited to determining "whether the hearing justice acted arbitrarily or capriciously in assessing the credibility of the witnesses or in finding such a violation." *State v. Tetreault*, 973 A.2d 489, 492 (R.I. 2009) (internal quotation marks omitted).

The defendant argues that, in light of his repeated references to his son throughout the two phone calls at issue, the hearing justice's finding that the recordings did not "depict to th[e] [c]ourt a loving father desiring to visit with the child" was arbitrary and capricious and lacked support in the record. The state, on the other hand, acknowledges that defendant mentioned his son in the phone calls but contends that those references were thinly veiled attempts to persuade

the individuals to whom he was speaking to have Ms. Suon visit him in person, so that he could tell her, without his words being recorded, to stop talking to the police. The state contends as follows:

> "The defendant wanted Ms. Suon to stop talking to the police, to not be used as a witness against him, to be convinced that this matter was between the two of them, to tell the police that the only reason she spoke to them initially was because they scared her, and that the police could not hurt her if she helped defendant out."

Thus, from the state's perspective, the hearing justice acted reasonably when she "categorically rejected defendant's argument that all of the statements at issue were aimed toward family harmony * * *."

Based on our review of the record, it is our view that there were at least two plausible interpretations of the above-referenced telephone conversations: the first being the expression of a desire on defendant's part to see his son and the second being, in the words of the hearing justice, defendant's desire to "quiet a witness." We are mindful of the principle that a hearing justice has not acted arbitrarily or capriciously when he or she has considered all of the evidence and has accepted one version of events while rationally rejecting another version. *See Bouffard*, 945 A.2d at 310-11. It is clear to us that this is precisely what the hearing justice did in this case. There is arguably ambiguity as to what defendant's intent was in his telephonic communications, but we fail to see how the hearing justice acted arbitrarily or capriciously in concluding as she did. *See Tetreault*, 973 A.2d at 493.

The hearing justice indicated that her decision was based on the "totality of the phone calls," and she commented:

> "During the phone conversations, the defendant made several statements. And I'm not going to go over all of the statements, but the statements included: 'Can't talk over the phone. Need you to call Rithy. Call this girl to talk to Rithy. She needs to come up

- 10 -

here and talk to me. Please, I need her to stop doing what she's doing. When you get a chance, call her at her job.' Other statements on the tape include: 'Convince her that she is safe if she does the right thing. She does not have to be afraid.'"

Additionally, the hearing justice expressly acknowledged the portions of the phone calls in which defendant expressed a desire to see his son, stating: "[T]he [c]ourt recognizes that statements on the tape include, 'I've never been away from my son this long.'" Nonetheless, after considering the phone calls in their entirety, the hearing justice found that defendant's purported motivation for the phone calls—that he wanted to see his son—was not persuasive because it "ma[de] no sense in light of the substance of the phone calls." She noted that the phone calls were "riddled" with defendant's attempts to have the individuals to whom he was speaking contact Ms. Suon and convince her to stop cooperating with police. Finding Ms. Suon to be a "highly credible" witness, the hearing justice accepted the state's interpretation of the gravamen of defendant's statements and stated that she was reasonably satisfied that defendant's actions constituted a "fail[ure] to keep the peace and be of good behavior."

In our view, there is sufficient evidence in the record to support the hearing justice's conclusion that defendant made phone calls with the intent to influence the statements and behavior of a key witness in the then-pending murder case against him and that he thereby violated the terms and conditions of his probation. Accordingly, it is our view that the hearing justice's decision adjudging defendant to be a probation violator was neither arbitrary nor capricious; and, therefore, we perceive no sufficient basis for overturning it. *See Hazard*, 68 A.3d at 501.

## B

## Sentence

It is well established that, "with respect to a trial justice's decision to execute all or a portion of a defendant's previously suspended sentence after a finding of probation violation, [t]he [trial justice] has wide discretion when determining the proper sentence to exact upon a probation violator, and we will uphold that decision unless it constitutes an abuse of that discretion." *State v. Roberts*, 59 A.3d 693, 697 (R.I. 2013) (internal quotation marks omitted). In determining how much of a previously suspended sentence to impose for a probation violation, a hearing justice's primary focus should be on the nature of the initial offense, although the hearing justice may also take into account the circumstances of the conduct that prompted the filing of a probation violation report—the "triggering offense." *State v. McKinnon-Conneally*, 101 A.3d 875, 879 (R.I. 2014). Our review of a hearing justice's probation-violation sentence is "for an abuse of discretion only." *Id.*

The defendant argues that, even if he was properly found to have violated the conditions of his probation, the six-year sentence imposed by the hearing justice was based on improper considerations and was excessive. The defendant claims that the hearing justice improperly based her decision to remove a large portion of his suspended sentence solely on the triggering offense (obstruction of justice); he argues that "the only reason [the hearing justice] offered for executing six out of the seven years of his suspended sentence was that 'he chose to quiet a witness' instead of 'let[ting] our justice system unfold.'" The defendant further contends that a sentence of three to four years to serve would have been appropriate and fair, in light of the fact that he had not previously been violated on his 2010 conviction and the fact that the maximum sentence for the charge of obstruction of justice would have been five years. Accordingly,

defendant avers that the hearing justice abused her discretion when she ordered him to serve six of the seven years of his suspended sentence.

In our view, the hearing justice did not abuse her discretion or rely on improper considerations when ordering defendant to serve six years of his previously suspended sentence. While the hearing justice unquestionably did consider defendant's phone calls in her sentencing decision, we have "never held that the trial justice must completely ignore the nature of the second offense when imposing a sentence for a probation violation." *State v. Pires*, 525 A.2d 1313, 1314 (R.I. 1987). Rather, the circumstances of the second offense may also be taken into account so long as the hearing justice is "guided principally by consideration of the nature of the first offense." *Id.* Thus, even though the hearing justice referred to defendant's alleged attempt to "quiet a witness" in her sentencing decision, that fact does not persuade us that the six-year sentence was solely based on the triggering offense of obstruction of justice.

The hearing justice explained that she had recounted the facts underlying the obstruction of justice charge merely to illustrate her finding that defendant was a probation violator, stating:

> "In so ruling, the [c]ourt is not weighing in on these underlying charges. Rather, it recounts the events that depict this poor behavior."

Furthermore, the hearing justice specifically couched her sentencing decision in terms of defendant's failure to abide by the terms and conditions of his probation, concluding that "[t]his defendant agreed to keep the peace and be of good behavior, and I'm reasonably satisfied that he did not do so." Based on these findings, the hearing justice stated: "I'm going to remove six years from the sentence."

Additionally, when defendant argued at the probation-violation hearing that "the triggering charge [was] a five-year maximum felony" and, therefore, in defendant's opinion, a

sentence of "three to four years" would be appropriate, the hearing justice expressly clarified that her decision was not based on the "triggering charge," stating: "I understand that it's a five-year felony, but I'm not sentencing on the five-year felony."

As we consider the hearing justice's decision as a whole, it is our view that she relied on the facts of the underlying charge of obstruction of justice—*i.e.*, the phone calls defendant made from the ACI—primarily for the purpose of determining whether defendant had violated the terms and conditions of his probation, and not for the purpose of determining the length of the sentence to be imposed. Her commentary throughout her decision makes clear that she "remove[d] six years from the sentence" because "defendant agreed to keep the peace and be of good behavior" as a condition of the probationary period imposed as a result of his 2010 conviction and because, in the hearing justice's estimation, "he did not do so." Thus, we are not persuaded that the hearing justice relied solely on those phone calls in sentencing defendant. Accordingly, we are satisfied that the hearing justice did not abuse her discretion in executing six of the remaining seven years of defendant's previously suspended sentence. *McKinnon-Conneally*, 101 A.3d at 879.

Finally, the defendant's argument that a sentence of three to four years would have been "appropriate and fair" does not change the fact that the hearing justice was legally empowered to impose "any or all of defendant's previously suspended sentence." *Id.* We have previously remarked that, "[l]ike the sword of Damocles, the unexecuted portion of a probationer's suspended sentence hangs over his or her head by the single horsehair of good behavior, until such time as the term of probation expires." *State v. Parson*, 844 A.2d 178, 180 (R.I. 2004). The fact that the defendant believes that a shorter sentence might have been appropriate or fair does

- 14 -

not mean that the six-year sentence was inappropriate or unfair or an abuse of the hearing justice's discretion.

## IV

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record may be returned to that tribunal.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Thomas Mosley. |
| **Case Number** | No. 2016-11-C.A. (P2/10-3252A) |
| **Date Opinion Filed** | December 8, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Sarah Taft-Carter |
| **Attorney(s) on Appeal** | For State:<br><br>Virginia M. McGinn<br>Department of Attorney General |
| | For Defendant:<br><br>Catherine Gibran<br>Office of the Public Defender |