August 28, 2024

**Supreme Court**

No. 2022-13-C.A.
(P1/16-2491AG)

State                    :

v.                    :

Thomas Mosley.           :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email: opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                          :

v.                             :

Thomas Mosley.                 :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.**  On the afternoon of August 13, 2014, a gunman entered Yusef A'Vant's Krazy Kuts barbershop in East Providence, Rhode Island.  A scuffle ensued, the result of which ended with A'Vant sustaining a fatal gunshot wound to the chest.  After two trials, the defendant, Thomas Mosley (Mosley or defendant), was convicted on multiple counts, including second-degree murder.  On appeal, the defendant identifies twenty-one appellate issues for our consideration.  Having carefully scoured the voluminous record and the parties' arguments, we discern no error.  The judgment of conviction is affirmed.[1]

---

[1] It is evident that many of the appellate issues were conceived and researched by the defendant.  We take this opportunity to express the Court's sincere appreciation to court-appointed defense counsel, who graciously included the defendant's legal arguments in an able and professional manner.

## Facts and Travel

Derek Winslow and A'Vant had an acrimonious relationship, leading Winslow to declare that he wanted A'Vant "got," which in street parlance evidently signifies "murdered." Winslow enlisted the assistance of Evan Watson; and after initially agreeing to kill A'Vant, Watson declined, advising Winslow that he "had a bad feeling," which proved prophetic. Undeterred, Winslow conscripted a replacement, Mosley; and in a subsequent conversation, Watson agreed to supply the gun and to drive Mosley to and from the barbershop. Thereafter, Watson testified against defendant and for the prosecution.

At trial, Watson provided critical testimony implicating Mosley in A'Vant's murder. He admitted providing a loaded .38 caliber revolver and driving Mosley to the barbershop. Watson detailed the route driven and described that, as they approached the barbershop, defendant reached into the glove compartment, retrieved the loaded revolver, and proceeded in the direction of the barbershop. He was not gone long. Watson testified that within minutes he heard gunshots and "immediately" thereafter witnessed defendant jogging back to the vehicle. As Watson drove away, Mosley stated to Watson, "it wasn't, like, supposed to go down like that" and "someone might have saw [me]."

Seth Waters also testified and explained that he visited the barbershop during his lunch break for a haircut. According to Waters, within minutes of his arrival, a

male opened the barbershop door, pointed a gun at his head, and told him "to get on the floor." Waters complied, and although he was not an eyewitness—because he was face-down on the floor—Waters recalled hearing A'Vant exclaim, "[y]ou've got to be kidding me," the sounds of a scuffle, and then the explosion of a gunshot. After the gunman fled the barbershop, Waters stood up and discovered A'Vant, bleeding from his stomach or chest area. Waters described the assailant to police and later assisted in compiling a composite sketch of the gunman.

According to Rithy Suon, Mosley's then-girlfriend and the mother of his child, one evening Mosley showed her a composite sketch. After Suon inquired concerning the significance of the sketch, Mosley smirked and mused that the sketch "was supposed to look like him." While Suon testified that she was not, at that time, unduly alarmed by defendant's comment, Suon recounted that later, after Mosley's arrest, he advised her that she was going to hear a recording of himself and a person Mosley referred to as "Little" (Michael Drepaul), with their infant son in the background. Suon related that Mosley directed her to tell "them" that she did not recognize any of the voices on the recording, an instruction she assumed meant the police.

Drepaul testified concerning firsthand knowledge of the forewarned conversation, which he had recorded surreptitiously at defendant's home. Drepaul related that, with the assistance of officers from the Providence Police Department,

he concealed a recorder in the pocket of his shorts, visited Mosley at his residence, and engaged Mosley in a lengthy conversation. After discussing matters not germane to this opinion, the conversation changed to a different topic. Without specifically mentioning the barbershop or A'Vant, Mosley recalled exiting a building and "hearing sirens. Like, I'm thinking that shit's for me." Mosley continued and described that he

> "rushes out and as I coming out * * * I'm hearing the sirens. * * * So in my mind I'm like * * * I, I, I looked, walked for a second and dipped * * * as I'm hitting the corner I see Staties flying by.[2] * * * Soon as I hit that corner, soon as I could -, soon as I hit that corner where they couldn't see me, 'boom,' took off. Floated. And fucking jumped in the wheels, jumped in the wheels."

Mosley's recitation of events also largely corroborated Watson's testimony concerning statements made by defendant during the getaway:

> "[W]hat happened was I was supposed to shake [A'Vant] up. [A'Vant] got funky fresh. You know what I'm saying? I had to give it to him. You know what I'm saying? I was supposed to shake [A'Vant] up. Yo drop to the floor. You know what I'm saying? Bust a shot and be out."[3]

---

[2] Kris Ellinwood, a then-patrol officer with the East Providence Police Department, testified that in the moments before the report of the shooting, a dispatch call was received concerning another incident. In responding to that incident, Officer Ellinwood activated the vehicle's emergency lights and siren and drove past the barbershop. Upon receiving the dispatch for the report of a shooting at the barbershop, Officer Ellinwood turned around and responded to the barbershop.

[3] The transcript uses a racial epithet, which we have replaced with A'Vant's name.

After Drepaul questioned whether "[h]e was the only one," defendant replied: "No, I'm saying I let the other one go. I don't think the other one, he got a good look at me, know what I'm saying"; and "[t]he other [person] stayed laying down."[4]

Providence Police Detective Theodore Michael also testified and was qualified as an expert in digital forensics, specifically geolocation with respect to Wi-Fi, GPS, and cellular site locations. After obtaining a search warrant to seize Wi-Fi location data associated with defendant's Google account, Det. Michael testified that he was able to trace the location of defendant's cellular telephone through its connection to Wi-Fi access points. Utilizing this method and data, Det. Michael determined that on August 13, 2014—the date of the murder—defendant's cellular telephone was located in Cranston at 1:45 p.m., moved in the direction of East Providence, and remained within a twenty-seven-to fifty-three-yard radius of the vicinity of the barbershop from 1:56 p.m. until 2:03 p.m. At 2:13 p.m., defendant's cellular telephone was tracked to within an approximate thirty-yard radius of 15 Princeton Avenue in Providence, Mosley's residence. Detective Michael also testified that on the late evening of August 11, 2014, to early morning of August 12, 2014—the day before the murder—defendant's cellular telephone was located in the vicinity of 68 Whipple Street in Cranston (Winslow's residence),

---

[4] The transcript uses a racial epithet, which we have replaced.

traveled to the barbershop in East Providence, with a radial proximity between twenty-six yards and seventy-one yards, and then traversed back to the vicinity of 68 Whipple Street.

On or about August 26, 2016, a grand jury returned a seven-count indictment against Mosley. On the same date, and as part of the same indictment, the grand jury returned a four-count indictment against Watson. The indictment charged both with murder; conspiracy to commit an unlawful act, to wit, murder; carrying a firearm without a license; and discharging a firearm while in the commission of a crime of violence. Mosley additionally was charged with three counts of obstruction of the judicial system, stemming from his instruction to Suon that she tell police that she did not recognize the voices on the Drepaul recording, as well as two recorded telephone conversations Mosley made while he was incarcerated at the Adult Correctional Institutions encouraging family members or friends to tell Suon not to cooperate with law enforcement officials. Watson's case was severed from that of defendant's based on his cooperation.

A jury trial commenced in the fall of 2019, at the conclusion of which Mosley was convicted of carrying a firearm without a license (count 3), discharging a firearm while in the commission of a crime of violence (count 4), and all three obstruction of justice counts (counts 5 to 7). The jury deadlocked on the remaining counts, murder (count 1) and conspiracy to commit murder (count 2). The trial justice

subsequently denied defendant's motion for a new trial with respect to count 3 and counts 5 to 7, but granted the motion for a new trial with respect to count 4, discharging a firearm while in the commission of a crime of violence.

In February 2020, a second trial ensued, encompassing the murder charge (count 1), the charge of conspiracy to commit murder (count 2), and the charge of discharging a firearm while in the commission of a crime of violence (count 4). The jury convicted Mosley of second-degree murder and discharging a firearm while in the commission of a crime of violence, and acquitted defendant of the charge of conspiracy to commit murder. After denying defendant's motion for a new trial, the trial justice sentenced Mosley to consecutive life sentences on counts 1 and 4, a ten-year concurrent sentence on count 3, and five years on counts 5 to 7, to be served concurrently, but consecutively to count 4. The trial justice also determined that defendant qualified as a habitual offender pursuant to G.L. 1956 § 12-19-21, and sentenced him to an additional twenty-year consecutive sentence, with ten years to be served and without parole at the ACI.[5] This appeal ensued.

---

[5] This Court is once again confronted with an incorrect judgment of conviction signed by a trial justice. In this case, the *corrected* judgment of conviction entered on July 14, 2021, does not contain the habitual-offender sentence. According to the record, on June 9, 2021, the trial justice adjudged Mosley a habitual offender and sentenced him

> "to a 20-year period, all of which without parole. You will be serving ten of it, the balance will be suspended with probation. That suspended time is obviously without

- 7 -

Additional salient facts will be set forth as necessary.

## Discussion

Mosley raises twenty-one appellate issues for our consideration. As discussed herein, the law with respect to these legal issues is well-trod and adverse to Mosley's position. For organizational purposes, we combine appellate arguments raising similar issues or legal principles.

### A

### Double Jeopardy

At the conclusion of the first trial, the jury found defendant guilty of carrying a firearm without a license (count 3), discharging a firearm while in the commission of a crime of violence (count 4), and three counts of obstruction of justice (counts 5 to 7). The jury was deadlocked on the murder charge (count 1) and the charge of conspiracy to commit murder (count 2), and, therefore, returned no verdict on these two charges.

---

parole. And that habitual sentence is to be served consecutively to all of the prior sentences that I have identified."

Additionally, the record evinces that although the trial justice sentenced Mosley to ten years on count 3, to be served *concurrently* with count 1, the corrected judgment of conviction indicates that on count 3, Mosley is to serve ten years *consecutively* to count 1. On remand, we direct the Superior Court to enter a second corrected judgment of conviction.

- 8 -

Subsequently, Mosley filed a motion to strike the verdict on count 4, discharging a firearm during the commission of a crime of violence, asserting that the guilty verdict was legally inconsistent with the jury's inability to reach a verdict on counts 1 and 2. The defendant also filed, pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure, a motion for a new trial, arguing that the verdict was against the weight of the evidence, against the sufficiency of the evidence, and against the weight and the sufficiency of the evidence.

The trial justice analyzed the motion for a new trial consistent with the weight of the evidence standard as the thirteenth juror, considering the evidence in light of the jury charge, independently assessing the credibility of the witnesses and the weight of the evidence, and determining whether he would have reached a different result. In so doing, the trial justice granted the motion for a new trial on count 4, and denied the motion for a new trial on counts 3, and 5 to 7.

With respect to count 4, the trial justice explained that, although the state did not have to prove the predicate offenses beyond a reasonable doubt, the state "does have to, at minimum, provide sufficient persuasive elements on the predicate criminal conduct." The trial justice continued that:

> "Here, the conduct was murder, and it was expressly alleged in the indictment that murder was the predicate crime of violence, and this jury could not agree on that [predicate] offense. If the jury could not agree on the basic elements of that misconduct, I don't think that the [c]ourt

- 9 -

should or, frankly, even can substitute its judgment in any contrary way."

On that basis, the trial justice afforded Mosley a new trial on count 4, discharging a firearm while in the commission of a crime of violence, and denied the motion to strike the verdict. Accordingly, the trial justice ordered a retrial on counts 1 and 2, upon which the jury was unable to reach a verdict, and on count 4.

On appeal, defendant reasserts that his conviction on count 4 was legally inconsistent with the jury's inability to reach a verdict on counts 1 and 2. However, he charges that the trial justice erred because "[t]he remedy is an acquittal on Count 4, not a new trial; this placed Mr. Mosley in double jeopardy for being tried twice for the same offense * * *." The defendant is incorrect.

Mosley's foundational argument that the verdict on count 4 is legally inconsistent with the verdict on counts 1 and 2 is a nonstarter. For well over a century, the United States Supreme Court has recognized that "a criminal defendant who successfully appeals a judgment against him 'may be tried anew * * * for the same offence of which he had been convicted.'" *Tibbs v. Florida*, 457 U.S. 31, 39-40 (1982) (quoting *United States v. Ball*, 163 U.S. 662, 672 (1896)). In so holding, the Supreme Court observed that "the Double Jeopardy Clause 'imposes no limitations whatever upon the power to *retry* a defendant who has succeeded in getting his first conviction set aside'" and that the rule "has persevered to the present." *Id.* at 40

(quoting *North Carolina v. Pearce*, 395 U.S. 711, 720 (1969)). Among the considerations supporting this rule of law, the Supreme Court explained, was that "retrial after reversal of a conviction is not the type of governmental oppression targeted by the Double Jeopardy Clause." *Id.* After distinguishing between the sufficiency of the evidence and the weight of the evidence, the Supreme Court summarized, "the rule barring retrial would be 'confined to cases where the prosecution's failure is clear.'" *Id.* at 41 (quoting *Burks v. United States*, 437 U.S. 1, 17 (1978)).

While defendant theorizes that the inability to render a verdict on count 1 is legally inconsistent with the guilty verdict on count 4, this Court has concluded otherwise:

> "'[T]he applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.' * * * The United States Supreme Court further indicated that '[a] single act may be an offense against two statutes; *and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other*.'" *State v. Rodriguez*, 822 A.2d 894, 905-06 (R.I. 2003) (emphasis added) (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).

Here, as in *Rodriguez*,

> "the state charged defendant with murder on count 1 and with using a firearm while committing a crime of violence (murder) on count 2. These crimes cannot merge because each required proof of a separate element (murder and using a firearm, respectively) that the other did not; thus, they constituted separate crimes." *Id.* at 906-07.

Because counts 1, 2, and 4 each required a separate element of proof, a conviction on each charge does not implicate the Double Jeopardy Clause. Moreover, as noted *supra*, "the Double Jeopardy Clause 'imposes no limitations whatever upon the power to *retry* a defendant who has succeeded in getting his first conviction set aside * * *.'" *Tibbs*, 457 U.S. at 40 (quoting *Pearce*, 395 U.S. at 720). Accordingly, we reject defendant's claim that double jeopardy bars his retrial on count 4.

## B

### The Second-Degree Murder and Accomplice Instructions

Mosley raises two contradictory arguments regarding the second-degree murder instruction. First, he complains that the trial justice erred during the first trial when *he refused* to charge the jury on the lesser-included offense of second-degree murder. Second, Mosley avers that the trial justice erred during the second trial when *he instructed* the jury on the lesser-included offense of second-degree murder, as well as committing error when he refused to render an accomplice instruction. Mosley contends that because "[t]he facts laid out in the first case were the same facts that were laid out in the second trial," the trial justice

- 12 -

was precluded from instructing on second-degree murder at the second trial pursuant to the law-of-the-case doctrine. Mosley is mistaken.

The defendant's initial claim that the trial justice erred during the first trial when he declined to instruct on second-degree murder is moot. In this respect, we have noted on numerous occasions that, if a court's decision concerning "a particular matter 'would fail to have a practical effect on the existing controversy, the question is moot, and we will not render an opinion on the matter.'" *State v. Gaylor*, 971 A.2d 611, 614 (R.I. 2009) (quoting *City of Cranston v. Rhode Island Laborers' District Council, Local 1033*, 960 A.2d 529, 533 (R.I. 2008)). While Mosley suggests that, had the jury at the first trial been instructed on second-degree murder, a second trial would have been unnecessary, this argument is nothing more than speculation. More importantly, assuming, *arguendo*, that Mosley is correct and the trial justice should have instructed the jury at the first trial on second-degree murder, our recourse on appeal would be to vacate the conviction for first-degree murder and direct the entry of a judgment of guilty on second-degree murder. Here, the jury at the second trial was instructed on second-degree murder and returned a verdict on that offense, rendering the argument concerning the lack of a second-degree murder instruction during the first trial utterly moot.

Undaunted, and having received an instruction on second-degree murder in the second trial, Mosley submits that the trial justice again erred, this time by

providing the second-degree murder instruction in contravention of the law-of-the-case doctrine.

Pursuant to this doctrine, when a "judge has decided an *interlocutory matter* in a pending suit, a second judge on that same court, when confronted at a later stage of the suit with the same question in the identical manner, should refrain from disturbing the first ruling." *State v. Graham*, 941 A.2d 848, 856 (R.I. 2008) (quoting *Richardson v. Smith*, 691 A.2d 543, 546 (R.I. 1997)). This Court has expressed that the law-of-the-case doctrine "does not have the finality of the doctrine of res judicata. It is more in the nature of a rule of policy and convenience." *Salvadore v. Major Electric & Supply, Inc.*, 469 A.2d 353, 356 (R.I. 1983). Here, "[w]e do not believe this doctrine is remotely applicable * * * because decisions by the trial justice on how to charge the jury are not interlocutory rulings." *Graham*, 941 A.2d at 856. Instead, this Court has "agree[d] with various other jurisdictions that explicitly have held that decisions to use certain jury instructions in a trial ending in a mistrial are not binding in a subsequent trial." *Id.* Accordingly, we reject defendant's argument that the trial justice was barred by the law-of-the-case doctrine from instructing the second jury on second-degree murder.

Mosley also posits that the trial justice erred when he failed to provide an accomplice instruction. This argument ignores our precedent.

- 14 -

In *State v. DeMasi*, 413 A.2d 99 (R.I. 1980), we rejected a similar argument that the trial justice erred when he failed to present an instruction concerning a coconspirator who provided inculpatory testimony in exchange for a grant of immunity. *See DeMasi*, 413 A.2d at 100. This Court deemed the omission proper and referenced that "[o]n other occasions we have refused to fault trial justices for refusing to charge a jury that an accomplice's uncorroborated testimony should be carefully scrutinized or that a jury must receive and consider an accomplice's testimony with caution." *Id.* (internal quotation marks omitted). In so doing, this Court advised that such an "admonition might be considered by the jury as a judicial impeachment of a witness, and it emphasized that in this jurisdiction a trial justice is under a strict obligation to avoid disclosing any opinion regarding the weight of the evidence or the credibility of the witnesses as long as the case is still before the jury." *Id.*; *see also State v. Collins*, 543 A.2d 641, 656 (R.I. 1988) ("[W]e are of the opinion that the trial justice's instructions on the subject of credibility were more than adequate."), *overruled on other grounds by State v. Rios*, 702 A.2d 889, 890 (R.I. 1997); *State v. Fenner*, 503 A.2d 518, 525 (R.I. 1986) ("[I]t is probably better practice for a trial justice to avoid giving such instructions in respect either to alibi testimony or to accomplice testimony and to rely instead upon general instructions concerning credibility, motivation, bias, and the like.").

In this case, there is no question that the jury was apprised of Watson's status as an accomplice and his accompanying baggage. Watson extensively testified concerning his role in A'Vant's death, his numerous prison sentences, and the fact that his testimony was procured through a cooperation agreement with the state in exchange for a recommended thirty-five-year sentence, which would be served concurrently to a previously imposed unrelated thirty-year sentence. These circumstances could not have been lost on the jury since, as the trial justice observed, Watson "arrived on the witness stand in leg shackles, prison garb, and in the company of uniformed sheriffs."

Consistent with *DeMasi*, *Fenner*, and *Collins*, the trial justice provided an extensive general credibility instruction, which included:

> "I spent some time when we were selecting you as jurors talking about credibility of witnesses. That's your job. Essentially, that's probably the most important job you have, and there's no magical formula by which you can weigh and assess and evaluate the credibility and the testimony of a witness. Basically, the jury system works because you, individually and collectively, decide for yourselves the reliability or the unreliability of statements made to you by others. And I suggest to you that the same tests that you use every day are probably the best tests to apply when you evaluate the credibility of witnesses.
>
> "Now, without limiting the generality of that statement, let me suggest some things you should consider.
>
> "You may be guided by the intelligence, the age, and the appearance of a witness, as well as by the conduct and the

- 16 -

demeanor of the witness while testifying. And also by his or her frankness and candor while testifying.

"You should consider the interest or lack of interest of the witness, if any, in the outcome of the case, and the bias or the prejudice of the witness, if any, as well as any criminal record or history of a witness.

"* * *

"You, as the jurors, are the quintessential judges of the credibility of witnesses. And it is entirely up to you to decide what portions, if any, of a witness's statements are truthful, their testimony to you during the trial or statements that they made to others prior to trial. And after making your own judgment, give the testimony of each witness such weight, if any, as you think it deserves."

The trial justice's thoughtful and comprehensive credibility instruction "adequately cover[ed] the subject matter relating to the request." *Fenner*, 503 A.2d at 525.

## C

### Motions for New Trial

"When passing on a motion for new trial, 'the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence.'" *State v. Cerda*, 957 A.2d 382, 385 (R.I. 2008) (quoting *State v. Bergevine*, 942 A.2d 974, 981 (R.I. 2008)). In so doing, "the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the

- 17 -

jury." *State v. Paola*, 59 A.3d 99, 104 (R.I. 2013) (brackets omitted) (quoting *State v. Vargas*, 21 A.3d 347, 354 (R.I. 2011)). "If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." *Cerda*, 957 A.2d at 385 (quoting *State v. Schloesser*, 940 A.2d 637, 639 (R.I. 2007)).

On appeal, "a trial justice's ruling on a motion for new trial is entitled to great weight provided that he has 'articulated an adequate rationale for denying a motion.'" *Cerda*, 957 A.2d at 385-86 (quoting *Bergevine*, 942 A.2d at 981). "A trial justice's ruling on a new-trial motion will not be overturned unless the trial justice was clearly wrong or unless he or she overlooked or misconceived material and relevant evidence that related to a critical issue in the case." *Id.* at 386 (quoting *State v. Lynch*, 854 A.2d 1022, 1046 (R.I. 2004)). We conclude that the trial justice appropriately and independently evaluated the evidence, properly assessed the credibility of the witnesses, and did not overlook relevant or material evidence.

After the first trial, Mosley was convicted of carrying a firearm without a license (count 3), discharging a firearm during the commission of a crime of violence (count 4), and obstruction of the judicial system (counts 5 to 7). As discussed *supra*, the trial justice granted defendant's motion for a new trial on count 4; accordingly, any claim that the trial justice erred by not granting a new trial on count 4 is moot.

- 18 -

With respect to the two obstruction-of-justice counts stemming from recorded

telephone conversations defendant made from the ACI, the trial justice recounted:

> "The jury heard the defendant on two tape-recorded phone
> calls from the ACI, in which he entreated people, someone
> called 'Ma,' for example, indeed, insistently instructing
> her to reach out to Rithy Suon and make certain that she
> stops talking to the police. He obviously knew full well
> that she could do him considerable damage in this
> homicide case. He couches his entreaties in these phone
> calls in the purported context of a father who is unfairly
> being separated from seeing his child, and that Rithy
> should not deprive him of that benefit."

Without needlessly recounting the conversations *in toto*, the trial justice highlighted:

> "The defendant recites that Rithy needs to come up here
> and talk to me and stop talking to or stop listening to
> anybody else. He says, 'Have everybody call her to try to
> convince her. Tell her she's safe if she does the right thing.
> She doesn't have to be scared of these people.' Obviously,
> referencing the authorities.
>
> "He laments in one of the calls that Rithy stopped coming
> out and she started talking to this prosecutor, and he says
> to the person he's speaking to on the telephone, 'Call her.
> Tell her, Ma, she needs to stop doing what she's doing to
> me. She needs to stop talking to who she's talking to.
> Please convince her to come up here and see me. She has
> to come up here and see me. She has to come up here and
> talk to me. She has to bring my son up here to see me. I
> need her to stop doing what she is doing.'"

Additionally, with respect to the remaining obstruction-of-justice count, the trial

justice recounted the evidence that defendant "tells Rithy personally that the police

are going to play a tape recording for her and that she should not identify his voice on it."

After reviewing this evidence, the trial justice appropriately employed the new-trial analysis and concluded:

> "The jury found, and I concur in that kind of judgment * * * that the defendant was intent on influencing and or having others on his behalf influence her behavior in statements with the intent of persuading her to stop cooperating with the police. In short, this jury found that the defendant tried mightily and corruptly to quiet Rithy Suon, whom he knew the State considered a key witness against him. And I don't think the jury was at all unwarranted in making that determination from the evidence presented at this trial."

Notably, on appeal, Mosley does not specifically identify that the trial justice overlooked or misconceived any relevant evidence in arriving at this decision.

On count 3, carrying a firearm without a license, the trial justice observed that there was no dispute that "Mr. Mosley did not have a duly-issued license to carry a pistol." The trial justice observed that "[t]he principal evidence that he had possession of the pistol is essentially or principally Evan Watson's testimony that the defendant personally took the pistol, which had been in the glove box in the car, got out of the vehicle with the gun, and shortly thereafter Watson heard gunfire." Again, defendant does not contest this determination.

Here, the record amply supports that the trial justice properly employed the analysis for a motion for a new trial, detailed the grounds for denying the motion,

- 20 -

and articulated clear and strong credibility determinations. *See State v. Karngar*, 29 A.3d 1232, 1235 (R.I. 2011) ("If the trial justice agrees with the jury's verdict or determines that reasonable minds could disagree about the outcome, then he or she must deny the new-trial motion * * *."). Accordingly, we discern no error in the trial justice's decision to deny the motion to grant a new trial on counts 3, and 5 to 7.

Mosley also challenges the trial justice's denial of the motion for a new trial after the second trial. Here, the trial justice issued a comprehensive and thoughtful thirty-page written decision recounting the evidence and the credibility of various witnesses. The trial justice concluded that he was "firmly convinced that the guilty verdict produced at Mosley's retrial was entirely appropriate, and this [c]ourt fully agrees with it." On appeal, Mosley's substantive argument is limited to a single sentence: "Reviewing the trial justice's decision *de novo* as delineated above, and examining the evidence in the light most favorable to the verdict, no rational trier of fact could have found Mr. Mosley guilty of second-degree murder and consequently committing the crime of violence of murder with a firearm." Mosley provides no authority or references to the record to support this contention.

The trial justice again employed the correct standard, comprehensively reviewing the evidence in light of the jury instructions, articulating detailed credibility determinations and discussing the weight of the evidence, and concluding

that "the guilty verdict produced at Mosley's retrial was entirely appropriate * * *." *See, e.g.*, *Paola*, 59 A.3d at 104. Notably, Mosley's appellate argument fails to identify any specific error committed by the trial justice. *See State v. Tavares*, 312 A.3d 449, 465 (R.I. 2024) (failing to develop a motion for a new trial argument constituted waiver). Notwithstanding the failure to develop an appellate argument, on the merits, our independent examination reveals no error in the trial justice's decision to deny the motion for a new trial after the second trial. *See Karngar*, 29 A.3d at 1235.

## D

## Inconsistent or False Statements

Mosley maintains that the trial justice erred when he denied defendant's motion to suppress the testimony of his former girlfriend, Rithy Suon, which, he submits, was obtained through coercive law enforcement efforts. Additionally, defendant avers that the trial justice erred by denying two motions to dismiss the indictment. Specifically, Mosley references grand jury testimony provided by Suon, during which she testified that defendant admitted to her that he had accidentally killed a person. It is undisputed that Suon later admitted that her grand jury testimony was false. The defendant also posits that the trial justice erred by not dismissing the indictment based upon the state's failure to elicit certain testimony during the grand jury proceeding, namely evidence suggesting that, when Winslow

recruited Mosley, Winslow's intent—and thus his instruction to defendant—was no longer to murder A'Vant. Mosley argues that the grand jury should have been apprised of this intent and that the state's failure to present it improperly skewed the evidence submitted to the grand jury. We disagree.

We first address the motion to suppress Suon's testimony. "In reviewing the trial justice's denial of defendant's motion to suppress the incriminating evidence, we defer to the factual findings of the trial justice, applying a clearly erroneous standard." *State v. Barkmeyer*, 949 A.2d 984, 995 (R.I. 2008) (deletion omitted) (quoting *State v. Apalakis*, 797 A.2d 440, 443 (R.I. 2002)). "It is well established that decisions concerning the admissibility of evidence are within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of that discretion is apparent." *State v. Stokes*, 200 A.3d 144, 150 (R.I. 2019) (quoting *State v. Alves*, 183 A.3d 539, 542 (R.I. 2018)). "The trial justice will not have abused his or her discretion as long as some grounds supporting his or her decision appear in the record." *Id.* (quoting *Alves*, 183 A.3d at 542).

In this case, Mosley essentially challenges the voluntariness of Suon's statements. This Court has long recognized, however, that "in order to challenge an alleged violation of constitutional rights and to have the fruits of the violation excluded by the trial court in the first instance, the individual alleging the deprivation

must be the one whose rights have been violated by the unlawful governmental conduct, not a defendant claiming to be aggrieved by introduction of damaging evidence." *State v. Vargas*, 420 A.2d 809, 814 (R.I. 1980). Suon does not challenge the voluntary nature of her statements.

Seemingly, defendant seeks to distinguish the assertion of Suon's constitutional rights, which he cannot challenge, from what he contends is his fundamental right that reliable evidence be presented that is not the product of coercion. In our opinion, this asserted distinction is of no moment; these circumstances go to the weight of the evidence, not its admissibility. Rather "the testifying witness may be examined by counsel in regard to the circumstances surrounding the giving of the statement, and the jury is free to give possibly coerced statements less weight than voluntary statements." *Vargas*, 420 A.2d at 814. Here, the record aptly demonstrates that this is precisely what occurred; Suon was subjected to extensive cross-examination concerning the circumstances by which her testimony was elicited. We thus reject defendant's claim that the trial justice erred when he denied the motion to suppress Suon's testimony.

The defendant also argues that the trial justice erred when he denied two motions to dismiss the indictment; the first based upon Suon's admittedly false testimony to the grand jury that Mosley told her that he accidentally killed a person, and the second based upon the state's failure to present to the grand jury what Mosley

submits is exculpatory evidence that Winslow's murderous intentions had changed by the time defendant was recruited.

In *Costello v. United States*, 350 U.S. 359 (1956), the United States Supreme Court considered whether an indictment should have been dismissed based on the alleged insufficiency of evidence presented to the grand jury. *See Costello*, 350 U.S. at 361. The Supreme Court rejected the argument, explaining that "[i]f indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed." *Id.* at 363. Critically, the Supreme Court concluded that "[a]n indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits." *Id.* (footnote omitted). This Court has not deviated from *Costello* and has also stated that "in the grand jury context * * * a 'subsequent guilty verdict means not only that there was probable cause to believe that defendant was guilty as charged, but also that he is in fact guilty as charged beyond a reasonable doubt.'" *State v. Russell*, 950 A.2d 418, 426 (R.I. 2008) (brackets omitted) (quoting *State v. Stone*, 924 A.2d 773, 782 (R.I. 2007)). Alternatively stated, a subsequent guilty verdict supersedes any infirmities that may have occurred "by a legally constituted and unbiased grand jury." *Costello*, 350 U.S. at 363.

Here, we conclude that the trial justice properly denied both motions to dismiss the indictment. While this Court in no way condones a witness conveying false testimony to the grand jury, Suon admitted, during the second trial, that her prior account concerning Mosley telling her that he had accidentally killed someone was false.[6] And, as we have previously noted, even if a witness "had perjured himself [or herself] before the grand jury * * * dismissal of the indictment would not have been required." *Lerner v. Moran*, 542 A.2d 1089, 1093 (R.I. 1988). Because defendant was subsequently found guilty beyond a reasonable doubt—and Mosley makes no allegation that Suon's testimony at the second trial was less than truthful—we discern no error.

Similarly, Mosley's contention that the indictment should have been dismissed because the state did not present to the grand jury alternative evidence to the effect that, as defendant suggests, Winslow's murderous intentions had abated when he was recruited, is utterly without merit. *See State v. Ellis*, 619 A.2d 418, 427 (R.I. 1993) ("We do not require that evidence that may later be determined by counsel for the defense to be exculpatory must be presented to the grand jury on pain of dismissal of the indictment."). Accordingly, the trial justice did not err when he denied the motions to dismiss the indictment.

---

[6] Critically, the record is devoid of any allegation or evidence that the state was aware of the perjured testimony at the time it was elicited.

## E

## Michael Drepaul and the ACI Recordings

With the assistance of officers from the Providence Police Department, Drepaul visited Mosley at his residence while surreptitiously recording their conversation. Mosley raises two issues with respect to the Drepaul recording, one issue related to recorded telephone conversations he had while incarcerated at the ACI, and one evidentiary issue. First, defendant contends that the trial justice abused his discretion in denying a motion to suppress the Drepaul recording, claiming that the recording was obtained in violation of the wiretap statute and was based upon "[s]tate action" without a warrant. Second, Mosley asserts that the trial justice abused his discretion in denying a motion *in limine*, which sought to preclude admitting the Drepaul recording into evidence. The defendant suggests that the poor quality of the recording, the numerous episodes of Mosley's infant son crying in the background, and various inaudible portions rendered the recording untrustworthy and unduly prejudicial. Third, Mosley submits that the trial justice erred when he denied a motion to suppress two telephone conversations recorded while defendant was incarcerated at the ACI as violative of the Fourth Amendment to the United States Constitution. Finally, Mosley asserts that the trial justice abused his discretion in overruling an objection to Drepaul's testimony, which referenced that defendant

had committed "murder." The defendant argues that such testimony invaded the province of the jury. We reject these contentions.

In *State v. Ahmadjian*, 438 A.2d 1070 (R.I. 1981), the defendants argued that the trial justice erred in denying a motion to suppress tapes and transcripts of conversations obtained through electronic surveillance. *See Ahmadjian*, 438 A.2d at 1079. Similar to the instant matter, in *Ahmadjian* the state police monitored and recorded certain conversations, which occurred between an unindicted coconspirator (with his knowledge and consent but without court approval) and defendants. *Id.* This Court rejected the defendants' claim of error and explained:

> "We hold that participant monitoring is not governed by the requirements of chapter 5.1. The State Police were not obliged to obtain a court order before monitoring [the coconspirator's] conversations with [the defendants] when [the coconspirator] had already consented. We believe that the legislative intent in enacting chapter 5.1 was to provide procedural safeguards for individuals in situations in which law enforcement officials desire to intercept wire or oral communications without the knowledge or the consent of any of the parties. In situations where an individual consents to having his communications monitored, G.L. 1956 (1969 Reenactment) § 11-35-21(c)(2), as assigned, P.L. 1969, ch. 55, § 3 applies." *Id.* at 1080 (emphasis omitted).

With one limited amendment (not relevant for our purposes), § 11-35-21(c)(2) remains the law today and provides that "[i]t shall not be unlawful under this chapter for * * * [a] person acting under color of law to intercept a wire, electronic, or oral

communication, where that person is a party to the communication, or where one of the parties to the communication has given prior consent to the interception[.]"

Here, Drepaul's testimony is pellucid that he was a willing and consenting participant to the recording of his conversation with defendant. Mosley's argument to this Court is in accord: "The State's reliance on the wiretapping statute is misplaced since essentially this was State action under the guise of one-party consent." Mosley makes no allegation that Drepaul was unaware of the recording device, and in fact, Drepaul extensively testified concerning the process by which the recorder was secreted in his clothing by law enforcement officers with his full knowledge and consent. Drepaul also testified that, after his conversation with Mosley, he personally returned the recorder to law enforcement officials. As we explained in *Ahmadjian*, in these circumstances, chapter 35 of title 11 does not apply.[7]

Mosley also claims that the trial justice abused his discretion by denying the motion *in limine* based on the quality of the recording. We disagree and note that

---

[7] Mosley also argues that the recording device in this case violated the state wiretap statute, G.L. 1956 § 11-35-21, and he directs our attention to *State v. O'Brien*, 774 A.2d 89 (R.I. 2001). In *O'Brien*, we noted that a surreptitious tape recording may violate the state wiretap statute, "but only if the taping is 'for the purpose of committing any criminal or tortious act in the violation of the constitution or laws of the United States or of any state or for the purpose of committing any other injurious act.'" *O'Brien*, 774 A.2d at 98 (quoting § 11-35-21). Here, no evidence or argument suggests this prerequisite has been satisfied.

we have reviewed the Drepaul recording and agree with the trial justice's cogent observation that "notwithstanding some indecipherable parts, most of which are not germane to the A'Vant killing, an intelligible transcription of the important portions was produced." The trial justice also appropriately and accurately described the Drepaul recording, noting that:

> "Mosley, without identifying his victim or the precise location of the barbershop, nonetheless provided details of the premises and of the event which could only have been chronicled by the perpetrator. Much of Mosley's tape-recorded recitation on that portion of the recording was corroborated by others, leaving no doubt that Mosley was narrating the A'Vant shooting to Drepaul."

The trial justice also properly instructed the jury consistent with our admonition in *Ahmadjian*: "Once transcripts are admitted into evidence, the trial justice should instruct the jurors that they are the final arbiter of their accuracy and reliability and that if the jurors perceive any differences between the tapes and the transcripts, they must rely on the tapes." *Ahmadjian*, 438 A.2d at 1082-83; *see also State v. Rivera*, 221 A.3d 359, 369 (R.I. 2019); *State v. Donato*, 414 A.2d 797, 805 (R.I. 1980) (holding no abuse of discretion in admission of audio recording that trial justice estimated was approximately 80 percent audible). The trial justice did not abuse his discretion in denying the motion *in limine* to preclude the Drepaul recording from evidence.

Third, Mosley contends that the trial justice abused his discretion in denying a motion to suppress his oral, written, and tape-recorded statements, including recordings of conversations at the ACI.[8] More specifically, defendant claims that, when the state subpoenaed his recorded prison telephone conversations for September 8, 2015, to September 14, 2015—about two months after his arrest—it violated his Fourth Amendment rights. The defendant asserts that the state's proffered reason to obtain the telephone recordings—the ongoing murder investigation—was unreasonable and "doesn't make sense" since that investigation was complete and culminated in his July 2015 arrest. Mosley is wrong.

During the suppression hearing, defense counsel acknowledged that defendant made the telephone calls in question. Further, it was undisputed that at the ACI, inmates must complete a consent form in order to obtain a PIN number (a prerequisite to using the telephones at the ACI), that signs are posted in the telephone area advising inmates that calls are monitored, and that a recorded message is played at the beginning of all telephone calls announcing to the participants that the conversation may be monitored. We note that the telephone calls in question were

---

[8] While defendant broadly frames this issue, the written arguments before this Court are limited to the recorded telephone conversations involving defendant while he was incarcerated at the ACI. To the extent Mosley complains about other oral, written, or tape-recorded statements—unless addressed elsewhere in this opinion—these arguments are waived. *See, e.g.*, *State v. Barros*, 148 A.3d 168, 174-75 (R.I. 2016); *Drew v. State*, 198 A.3d 528, 530 (R.I. 2019) (mem.) (holding that failure to meaningfully develop an appellate argument constitutes waiver).

not made to an attorney nor were they otherwise privileged; they served as the basis for two of the obstruction-of-justice charges upon which Mosley was convicted.

Under similar circumstances, the United States Court of Appeals for the First Circuit has concluded that "inmates and pretrial detainees who have been exposed to the sort of warnings that [an inmate] saw here have been deemed to have consented to monitoring." *United States v. Novak*, 531 F.3d 99, 102 (1st Cir. 2008) (concluding no Fourth Amendment violation when attorney-client conversation was monitored in violation of regulation);[9] *see also United States v. Footman*, 215 F.3d 145, 155 (1st Cir. 2000) (holding that "a prison inmate's express acceptance of having his calls recorded as a condition of using the telephone" constitutes consent).[10]

---

[9] We conclude only that under the circumstances present in this case, Mosley's recorded conversation with a non-attorney did not violate the Fourth Amendment to the United States Constitution. We need not reach the precise issue discussed in *United States v. Novak*, 531 F.3d 99 (1st Cir. 2008), concerning whether a recorded attorney-client conversation violated the Fourth Amendment or the state analog.

[10] Mosley asserts that "the seizure of prison communications by subpoena must be reasonable for Fourth Amendment purposes" and that this standard requires "a determination whether (1) the contested actions furthered an important or substantial government interest, and (2) the contested actions were no greater than necessary for the protection of that interest." (Citing *Whitehurst v. State*, 83 A.3d 362, 367 (Del. 2013).) While Delaware may have adopted such standard, there is no Rhode Island or binding federal court authority that adopted a similar standard, nor has Mosley identified any such authority.

Finally, Mosley argues that the trial justice erred in overruling an objection made in reaction to Drepaul's testimony, as well as the court's failure to provide a curative instruction. During direct examination, the state elicited testimony that, when Drepaul visited Mosley at his residence for the purpose of eliciting and recording incriminating statements, the initial conversation had nothing to do with A'Vant's death. After testifying that the topic of conversation changed, Drepaul was asked: "And what did the topic of the conversation turn to?" Drepaul responded, "[t]he murder that he committed." Mosley objected to Drepaul's characterization of A'Vant's death as a "murder," asserting that such a conclusion was within the exclusive determination of the jury. This argument is without merit.

It is undisputed that, after suffering a single gunshot wound to the chest, A'Vant was murdered. The manner of death in this case—homicide—has never been contested, but rather the question presented to the jury for its consideration was whether *this defendant* murdered A'Vant.

As the second trial commenced, the trial justice instructed the venire on precisely this focus, advising the potential jury members that "this is a criminal case" and that the charges "brought against the defendant, Mr. Mosley, alleging that on or about the 13th of August, in the year 2014, he *murdered* an individual named Yusef A'Vant in East Providence." (Emphasis added.) Following the close of evidence, the trial justice also instructed the jury that "[i]t's you, and you alone, who have the

responsibility for making credibility and factual determinations and the ultimate determination as to the proper verdict in the case."

Under these circumstances, we are satisfied that the trial justice did not abuse his discretion in overruling the objection concerning the admissibility of testimonial evidence and that Drepaul's reference to "murder" did not invade the province of the jury. *See, e.g.*, *State v. McManus*, 990 A.2d 1229, 1234 (R.I. 2010) ("The applicable standard of review of a trial justice's admission of evidence is a clear abuse of discretion."). Nor did the trial justice err by declining to provide an immediate curative instruction in lieu of the general instruction provided by the trial justice at the conclusion of testimony. The defendant did not move to pass the case. We perceive no error.

## F

## Joinder and Severance

The defendant insists that the trial justice erred when he failed to sever the obstruction-of-justice charges (counts 5 to 7) from the remaining charges. Mosley invokes Rules 8 and 14 of the Superior Court Rules of Criminal Procedure and maintains that the obstruction charges should not have been joined and/or should have been severed because those "charges occurred a year after the gun charges, are not of the same or similar character, are not based on the same charge of murder, do not constitute part of a common scheme or plan, are brought under different statutes,

do not involve the same victims, locations, modes of operations or time frames." The trial justice rejected this argument, and we concur. In so doing, we note that because he was convicted of these offenses at the first trial, as a matter of law, these obstruction charges were severed during the second trial.

Rule 8(a) provides:

> "Two (2) or more offenses may be charged in the same indictment, information, or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of *the same or similar character or are based on the same act or transaction or on two (2) or more acts or transactions connected together or constituting parts of a common scheme or plan*." (Emphasis added.)

As this Court has explained, "Rule 8(a) permits the state to charge a defendant with multiple offenses in a single indictment or information." *State v. Pereira*, 973 A.2d 19, 25 (R.I. 2009). "Because proper joinder under Rule 8(a) is a matter of law, we review *de novo* whether the state properly joined one or more charges in a single indictment * * *." *Id.* (quoting *State v. Hernandez*, 822 A.2d 915, 918 (R.I. 2003)). Rule 8(a) "permits such joinder of offenses in the same indictment if the offenses charged are of the same or similar character or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan." *State v. Ciresi*, 45 A.3d 1201, 1216 (R.I. 2012) (brackets omitted) (quoting *State v. Trepanier*, 600 A.2d 1311, 1315-16 (R.I. 1991)).

Here, the trial justice concluded that the three obstruction charges and the underlying gun and homicide charges were part of a common plan or scheme appropriate for joinder under Rule 8(a). We agree and adopt the trial justice's cogent observation that "there's a connection or a nexus between the obstruction counts and the alleged homicide charge * * *. Clearly, they are connected. They are intertwined with the murder accusation." Markedly, and contrary to defendant's position, the record demonstrates a common scheme or plan connecting all charges; specifically, that on July 8, 2015, defendant was held at the ACI without bail,[11] and that in the ensuing months—from July 29, 2015, to September 8, 2015—defendant embarked on a course of conduct intended to influence the testimony of Suon, a person this Court previously described as "a key witness in the state's then-pending case against defendant for the murder of Yusef A'Vant." *State v. Mosley*, 173 A.3d 872, 877 n.4 (R.I. 2017).

---

[11] On July 8, 2015, the state filed a probation-violation report pursuant to Rule 32(f) of the Superior Court Rules of Criminal Procedure, alleging that defendant violated the terms and conditions of probation and "had been charged with the murder of one Yusef A'Vant." *State v. Mosley*, 173 A.3d 872, 875 (R.I. 2017). The state later filed a second Rule 32(f) report, "alleging that defendant had been charged with obstruction of the judicial system while making certain phone calls from the ACI between September 6 and September 10, 2015 * * *." *Id.* A justice of the Superior Court declared defendant a probation violator on the basis of the obstruction-of-justice charges. *Id.* at 878. The probation-violation proceeding forms the basis of Mosley's argument that the state was collaterally estopped from the criminal prosecution, an allegation we address *infra*.

We also agree with the trial justice's later conclusion that "even if the obstruction counts had not been substantively charged in the indictment, the statements that are the subject of these [obstruction counts], they, themselves, are extraordinarily relevant * * *. They reflect an effort to keep a witness from testifying adversely to the defendant in a murder charge." Under similar circumstances, many United States Circuit Courts of Appeals have embraced a similar construction of rules that are essentially equivalents of Rule 8(a). *See, e.g.*, *United States v. Lingala*, 91 F.4th 685, 693 (3d Cir. 2024) ("The witness tampering charges in Counts Three and Four are clearly 'connected with' Counts One and Two in 'a common scheme or plan,' namely, hiring a hitman to kill Alkanti."); *United States v. Stackpole*, 811 F.2d 689, 694 (1st Cir. 1987) ("Were the counts severed, substantially the same evidence would have been admitted in both resulting trials. In a trial on the arson and related charges, the obstruction of justice acts would have been admissible to show consciousness of guilt."). We conclude that joinder was proper.

"[E]ven though offenses may be appropriately joined in a single indictment, a defendant may move for severance of said counts for purposes of trial in the event that he or she is able to show such prejudice as might constitute a denial of his or her right to a fair trial, pursuant to Rule 14 of the Superior Court Rules of Criminal Procedure." *Ciresi*, 45 A.3d at 1216 (brackets omitted) (quoting *State v. Goulet*, 21 A.3d 302, 309 (R.I. 2011)). In relevant part, Rule 14 states, "[i]f it appears that a

defendant or the State is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires." Super. R. Crim. P. 14. Questions surrounding severance based on Rule 14 are "within the sound discretion of the trial justice, and we will not disturb his or her decision on appeal absent the showing of a clear abuse of discretion." *Ciresi*, 45 A.3d at 1216 n.16 (quoting *Goulet*, 21 A.3d at 309).

"To prevail in demonstrating that a trial justice has abused his or her discretion, a defendant must show that the trial justice's denial of the motion to sever prejudiced the defendant to such a degree that he or she was denied a fair trial." *Ciresi*, 45 A.3d at 1216-17 (brackets omitted) (quoting *Pereira*, 973 A.2d at 28). "It is not sufficient for the defendant to cite the potential for and the likelihood of prejudice. His burden is to demonstrate *substantial prejudice* resulting from the joinder." *Id.* at 1217 (quoting *State v. Day*, 898 A.2d 698, 705 (R.I. 2006)). "Substantial prejudice is determined by balancing efficiency and convenience in judicial administration on the one hand and the defendant's right to a fair trial without prejudice on the other." *Id.* (quoting *State v. Rivera*, 987 A.2d 887, 900 (R.I. 2010)). This Court has observed that substantial prejudice may occur in the following circumstances:

> "(1) The defendant may become embarrassed or confounded in presenting separate defenses; (2) the jury may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which it found his guilt of the other crime or crimes charged; or (3) the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find." *Id.* (brackets omitted) (quoting *Rivera*, 987 A.2d at 900).

We have also recognized that substantial prejudice "may reside in a latent feeling of hostility engendered by the charging of several crimes as distinct from only one." *Id.* (quoting *State v. Patriarca*, 112 R.I. 14, 30, 308 A.2d 300, 311 (1973)).

Critically, "[i]n general, the right to a fair trial is not prejudiced by the joinder of charges in cases in which the outcome would have been the same if separate trials had been held." *Ciresi*, 45 A.3d at 1217 (quoting *Pereira*, 973 A.2d at 30). In this respect, we have observed that:

> "'When the evidence admitted in a trial on the joined charges would be mutually admissible in separate trials, it is not likely that the defendant can show that he actually was prejudiced by the joinder.' * * * Moreover, in *Pereira*, this Court highlighted that even in cases in which 'the evidence may not be mutually admissible in separate trials, we are not compelled to assume that the defendant has been prejudiced.' * * * Rather, severance under Rule 14 is generally not necessitated 'when the evidence related to each one of the counts is straightforward, simple, and distinct.'" *Id.* (quoting *Pereira*, 973 A.2d at 30, 31).

Here, we are satisfied that the trial justice did not abuse his discretion when he denied the motion to sever. Specifically, at the conclusion of the first trial, the

trial justice instructed the jury that with respect to its consideration of all seven charges, "each alleged violation must be considered by you separately, and the State must prove its case beyond a reasonable doubt as to each violation."

It is evident that the jury heeded the trial justice's instruction because it returned guilty verdicts on counts 3 to 7 and hung on counts 1 and 2. Not only was the evidence "straightforward, simple, and distinct," but the split verdict accorded with the presumption that "juries are able to respond impartially to the trial evidence with the assistance given by instructions from the trial justice." *Ciresi*, 45 A.3d at 1217, 1218; *see also Pereira*, 973 A.2d at 28 ("The defendant must show that he did, in fact, suffer real and substantial prejudice.").

Having been convicted of the obstruction charges during the first trial, those charges were effectively severed from defendant's retrial, which resulted in his conviction on the charges of second-degree murder and discharging a firearm during the commission of a crime of violence. Moreover, during the second trial, the facts underlying the obstruction-of-justice charges were admitted into evidence.[12] *See Ciresi*, 45 A.3d at 1217 ("When the evidence admitted in a trial on the joined charges

---

[12] Prior to the first trial, defense counsel did object to the admissibility of the ACI recordings, but the trial justice overruled this objection, which ruling we have affirmed. Based on the record before us, it is unclear whether defense counsel renewed the objection prior to and/or during the second trial. Since this Court has not been presented with a waiver argument, we have no occasion to address it.

would be mutually admissible in separate trials, it is not likely that the defendant can show that he actually was prejudiced by the joinder.") (quoting *Pereira*, 973 A.2d at 30). Thus, there is no link between defendant's conviction on the obstruction-of-justice charges and defendant's conviction on the underlying homicide and gun charges. We conclude that the trial justice did not abuse his discretion when he denied the motion to sever.

## G

### Admissibility of the Google Wi-Fi Data

Mosley alleges that the trial justice abused his discretion and thus erred when he: (1) denied a motion *in limine* to exclude or limit expert testimony, (2) denied a motion to suppress the Google Wi-Fi data, and (3) denied a motion to preclude admission of Google records into evidence under the business records exception to the hearsay rule.[13] In sum, the testimonial and documentary evidence traced

---

[13] Although Mosley's written arguments to this Court identify (in a heading) the trial justice's decision to allow the Google records into evidence under a hearsay exception, defendant does not expand upon this argument in his brief. Accordingly, this issue is waived. *See Drew*, 198 A.3d at 530 ("[S]imply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue.") (quoting *Dunn's Corners Fire District v. Westerly Ambulance Corps*, 184 A.3d 230, 235 (R.I. 2018)).

Notwithstanding the waiver issue, this issue is meritless. In his written decision denying the motion to preclude the use of the Google records, the trial justice observed that Chelsea Clays, a Google records custodian, identified the geolocation data (preserved on a disc) and certified that the disc contained precise

defendant's cellular telephone on the late evening of August 11, 2014, to the early morning hours of August 12, 2014, traveling from Winslow's residence in Cranston, to the vicinity of the barbershop in East Providence, and back to Winslow's residence. The evidence also illustrated that in the minutes before the murder on August 13, 2014, defendant's cellular telephone traveled in the direction of East Providence and remained within a twenty-seven-to fifty-three-yard radius of the vicinity of the barbershop from 1:56 p.m. until 2:03 p.m. Thereafter, at 2:13 p.m., defendant's cellular telephone was traced to a location within an approximate thirty-yard radius of 15 Princeton Avenue in Providence, Mosley's residence.

In his written decision denying the motions, the trial justice referenced three methods by which a person's cellular telephone may be tracked. First, Global Positioning System (GPS) "is a proven Government methodology which relies on satellites for positioning, navigation and timing. GPS receiver equipment is * * * typically included in modern mobile devices ('smart phones'). A cell phone exchanges signals with satellites, and the transmitted information is used to identify the user's location." Second, cellular-site location or so-called towers; "[m]ost

---

and accurate copies of the data retrieved from Google's records. Clays testified that the information was automatically electronically collected by Google and that unique identifiers had been assigned to the data files. Clays also confirmed that Google relies upon the data, which it collects in the conduct of its ordinary business. *See State v. Adams*, 161 A.3d 1182, 1199 (R.I. 2017) ("It is our opinion that the trial justice did not abuse his discretion in allowing the cell phone records to be admitted into evidence * * *.").

modern phones tap into the wireless network several times a minute whenever their signal is on, whether or not the user knows it and regardless of whether he or she is even using one of the phone's features. Each time the phone connects to a cell site, it generates time-stamped location information." Third, Google Wi-Fi data, the method used in this case, which, the trial justice explained, "relies on Wi-Fi signals to determine the distance between the cell phone and a signal 'access point,' which is a device such as a router in an office or in a home, which creates a wireless local area network by projecting a Wi-Fi signal within a designated area." Google collects the Wi-Fi "scans," which identify the access points a particular cellular telephone "sees" at a certain time and at a designated location. In order for a cellular telephone to interface with an access point, the cellular device must be nearby, typically no more than fifty yards away.

Rule 702 of the Rhode Island Rules of Evidence provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion."

"[W]hen a party seeks to introduce novel or complex evidence, the trial justice will exercise a gatekeeping function." *Morabit v. Hoag*, 80 A.3d 1, 11 (R.I. 2013). "In performing that gatekeeping role, the trial justice holds 'a preliminary

- 43 -

evidentiary hearing outside the presence of the jury in order to determine whether such evidence is reliable and whether the situation is one on which expert testimony is appropriate.'" *Id.* (quoting *DiPetrillo v. Dow Chemical Company*, 729 A.2d 677, 685 (R.I. 1999)). "The trial justice's primary function as gatekeeper is to make certain 'that the proposed expert testimony, presented as a scientifically valid theory, is not mere junk science.'" *Id.* (quoting *Owens v. Silvia*, 838 A.2d 881, 891 (R.I. 2003)).

In *DiPetrillo*, we identified four nonexclusive factors to assist a trial justice in determining the reliability and validity of expert testimony involving novel or technically complex theories or procedures. *See DiPetrillo*, 729 A.2d at 689; *see also Morabit*, 80 A.3d at 12. Those factors are:

> "(1) whether the proffered knowledge has been or can be tested; (2) whether the theory or technique has been the subject of peer review and publication; (3) whether there is a known or potential rate of error; and (4) whether the theory or technique has gained general acceptance in the scientific community." *Morabit*, 80 A.3d at 12 (citing *DiPetrillo*, 729 A.2d at 689).

"Satisfaction of one or more of these factors may suffice to admit the proposed evidence and the trial justice need not afford each factor equal weight." *Id.* Importantly, this Court has recognized that "when the proffered knowledge is neither novel nor highly technical, satisfaction of one or more of these factors is not a necessary condition precedent to allowing the expert to testify." *Id.* (quoting *Owens*,

- 44 -

838 A.2d at 892). "If the expert's evidence is not novel, then the foundation need not be novel either." *Id.* (quoting *DiPetrillo*, 729 A.2d at 688).

The *DiPetrillo* factors were intended "to liberalize the admission of expert testimony by providing a mechanism by which parties can admit new or novel scientific theories into evidence that may have previously been deemed inadmissible." *Morabit*, 80 A.3d at 13 (quoting *Owens*, 838 A.2d at 892). "If 'the evidence presented to support the expert's proposed opinions is sufficient to allow a reasonable juror to conclude that his methods are grounded in valid science, then cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the appropriate means of attacking the reliability of this evidence.'" *Id.* (deletion omitted) (quoting *Owens*, 838 A.2d at 899-900). "Thereafter, the jury can decide how much weight—if any—to give an expert's opinions in light of the dearth of peer-reviewed studies and published protocols to corroborate his or her specific theories." *Id.* (deletions and brackets omitted) (quoting *Owens*, 838 A.2d at 900).

In denying defendant's motions to preclude testimony concerning the Google Wi-Fi data, the trial justice concluded that "expert testimony fixing the location of cell phones is simply not novel intellection. Such evidence has been introduced by qualified experts in Rhode Island and in numerous other forums." In so doing, the trial justice referenced, among other cases, *State v. Adams*, 161 A.3d 1182 (R.I.

2017), in which we observed that "expert testimony regarding cell phone towers was not novel." *Adams*, 161 A.3d at 1196. Because the cellular phone tower technology was not novel, this Court concluded that "no evidentiary hearing was necessary, the state 'needed only to show that [the proposed expert] arrived at his conclusion in what appeared to be a scientifically sound and methodologically reliable manner.'" *Id.* (deletion and brackets omitted) (quoting *Owens*, 838 A.2d at 892).

Here, we reach the same determination and conclude that the trial justice did not abuse his discretion when he denied the motions to preclude testimonial evidence concerning the Google Wi-Fi data. *See Adams*, 161 A.3d at 1194 ("It is well established that decisions concerning the admissibility of evidence are 'within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of that discretion is apparent.'").

As the trial justice noted, Det. Michael, the state's proffered digital forensic expert, "is a major crimes investigator assigned to the Providence Police Department's Digital Forensic Unit, which analyzes all of the digital evidence submitted to the Providence Police Department." Detective Michael has been assigned to that unit for several years; has been trained in, studied, and utilized the GPS, cellular-site, and Wi-Fi location methods; and has been trained by the Cellular Analysis Survey Team, the same organization of which the expert in *Adams* was a member. *See Adams*, 161 A.3d at 1194. He has also participated in extended

seminars conducted by the Federal Bureau of Investigation and the Secret Service, and at the time of trial was a task force officer in both federal agencies.

Detective Michael also testified that in the two years preceding the trial justice's decision, he received particularized Wi-Fi training, participated in monthly webinars, and studied current scientific journals and peer-reviewed articles on the topic. The trial justice also deemed it notable, as do we, that Det. Michael's "opinion as to the nature and accuracy of the three methodologies has been corroborated by other professionals."

In addition to Det. Michael's impressive qualifications, the evidence presented at trial demonstrates that the Google Wi-Fi technology is "scientifically sound and methodologically reliable * * *." *Adams*, 161 A.3d at 1196 (quoting *Owens*, 838 A.2d at 892). Detective Michael testified that compared to the GPS method, "Wi-Fi, it narrows it down to about 150 feet, * * * [v]ery, very, very accurate." In this vein, Det. Michael's opinion that Wi-Fi data is reliable is shared by the expert in a reported Delaware trial court decision, which both parties reference in support of their positions. Indeed, Google Wi-Fi location data has already been admitted into evidence (and apparently its reliability was unchallenged) in Rhode Island courts. *See State v. Baribault*, 247 A.3d 1237, 1243 (R.I. 2021) (referencing Google location history that revealed position of the defendant's truck and cellular phone).

The testimony also illustrated that the three methodologies work in tandem. For instance, Det. Michael explained:

> "If there is no signal within that 150 feet, the Wifi will transmit to GPS. The GPS signal and/or a cellular tower signal will then captivate. All three working in conjunction with one another, and all three work kind of in the back room. Where the signal is strongest, the signal will show."

In this respect, on the day of the murder, Mosley's cellular telephone lost connectivity to a Wi-Fi access point and switched to GPS and/or cellular tower locations. The coordinates for the three methods were consistent, further evidencing the reliability of the Wi-Fi technology. *See DiPetrillo*, 729 A.2d at 689 (noting that additional considerations bearing on reliability include "the relationship of the technique to methods that have been established as reliable"). On this record, we reject defendant's abuse-of-discretion argument.

**H**

**Additional Allegations**

Mosley raises and has preserved additional allegations, none of which merit extended discussion. We address these issues *seriatim*.

First, Mosley contends that the trial justice erred by denying his motion to dismiss the indictment on the basis of the collateral estoppel doctrine. Specifically, Mosley argues that the state alleged the same conduct at the Rule 32(f) probation-violation hearing. Although a justice of the Superior Court determined

that Mosley was a probation violator based on the conduct stemming from the obstruction-of-justice charges, the hearing justice declined to address the possible probation consequences arising from the murder charge, stating that "[t]here is no need to address the second violation since the court has just ruled [defendant violated the terms and conditions of probation]." *Mosley*, 173 A.3d at 878 n.5 (brackets omitted). Mosley asserts that "the State essentially put [him] in double jeopardy on the same charges in this case, and should be collaterally estopped from same."

Recently, we rejected the identical argument and in so doing, explained that "further application of the doctrine of collateral estoppel to bar relitigation of a criminal charge, following a determination during a probation-revocation hearing that is adverse to the state, inequitably overlooks and misconceives the inherent and important differences between those proceedings and criminal trials." *Tavares*, 312 A.3d at 470 (quoting *State v. Gautier*, 871 A.2d 347, 358 (R.I. 2005)). We added that "practical public policy requires that new criminal matters, when charged in the criminal justice system, must be permitted to be there decided, unhampered by any parallel probation-revocation proceedings." *Id.* at 471 (quoting *Gautier*, 871 A.2d at 359). Accordingly, we reject defendant's claim that collateral estoppel bars the state from presenting the same charges upon which the hearing justice either based the probation-revocation determination or declined to consider as a basis for the probation-revocation determination.

Second, Mosley argues that the trial justice erred when he denied a motion to recuse. On September 6, 2016, defendant's then-court-appointed defense counsel attended the arraignment of Watson and acted as stand-in counsel in place of Watson's attorney. As Mosley's then-court-appointed defense counsel related during a November 4, 2016 hearing:

> "On the arraignment of the co-defendant, Mr. Watson, he was represented by Attorney Judith Crowell. Attorney Judith Crowell unfortunately sustained an injury and was unavailable to execute the formal document saying that she represented Mr. Watson in this case. I was asked to sign her name to an entry of appearance. I never met Mr. Watson. I did meet him that day; I said hello. I didn't ask him any questions about the case. And I signed Judith Crowell's name to the entry of appearance and entered a not guilty for Mr. Watson. That was the extent of my representation of Mr. Watson.

> "I do not have a conflict of interest with respect to that entry of appearance. I explained that to Mr. Mosley. I said to Mr. Mosley that I have no intention of authorizing any information, which I don't have, against Mr. Mosley, but I needed to have him understand that all I was, was a fill-in one day to sign somebody's name."

Mosley sought to "reserve" his right to assert a conflict of interest with his then-court-appointed defense counsel and the trial justice warned that "if I find that your complaint, if you have one, is such that there is no foundation and is ephemeral, and is in no way substantiated, you don't get another lawyer; you represent yourself." On or about December 9, 2016, the trial justice permitted defendant's then-court-appointed defense counsel to withdraw, and on December 19, 2016,

substitute court-appointed defense counsel filed an entry of appearance. Nearly three years later, on June 11, 2019, defendant filed a motion seeking recusal of the trial justice, asserting that the trial justice's decision and comment during the November 4, 2016 hearing "struck Mr. Mosley as unfair."

"When a party argues on appeal that a trial justice should have recused himself or herself due to bias or prejudice, we must 'scrutinize closely whatever is asserted to have disclosed prejudice of a character and in such degree as to work a disqualification.'" *State v. Washington*, 189 A.3d 43, 64 (R.I. 2018) (quoting *State v. McWilliams*, 47 A.3d 251, 257 (R.I. 2012)). "[T]he party seeking recusal bears the burden of establishing that the judicial officer possesses a personal bias or prejudice by reason of a preconceived or settled opinion of a character calculated to impair his or her impartiality seriously and to sway his or her judgment." *Id.* (brackets omitted) (quoting *State v. Howard*, 23 A.3d 1133, 1136 (R.I. 2011)). "To prevail on a recusal motion based on bias, a party must show that there are facts present such that it would be reasonable for members of the public or a litigant or counsel to question the trial justice's impartiality." *Id.* at 65 (quoting *In re Jermaine H.*, 9 A.3d 1227, 1230 (R.I. 2010)).

Based on our careful review of the record, we are satisfied that Mosley has not met his heavy burden in this case. In so doing, we observe that defendant's motion to recuse was filed nearly three years after the November 4, 2016 hearing

and months prior to the commencement of his first trial. The defendant's allegation of error is completely unsubstantiated by the record before us and is without merit.

Third, defendant avers that the trial justice erred when he allowed the hearsay testimony of Cassandra Brooks. Brooks testified that in November 2014 she contacted the East Providence Police Department—believing she was anonymous—and reported that she overheard Mosley "bragging" about his involvement in A'Vant's murder at the barbershop. After defendant's arrest in July 2015, Brooks was interviewed by law enforcement. According to Brooks's trial testimony, during this interview, she "provided the same information, but the story in which it was told or provided to me was changed." Specifically, Brooks testified at the second trial, "I changed the person in which the information was being told. So at first I said it was Mr. Mosley, but then I said it was provided by his girlfriend."

Thereafter, in preparation for her testimony at the first trial, Brooks advised prosecutors that the content of what she initially told the East Providence Police Department in November 2014 remained the same, but she attributed the information to yet a third source. Specifically, Brooks testified at the second trial, "now I had to reveal the true source of the information that I was giving, which was my boyfriend at the time, he told me something in confidence, in which I repeated it, and I didn't want to get him in trouble, so I changed the story." On appeal, defendant argues that

the trial justice abused his discretion in allowing Brooks's testimony, which he describes as hearsay.

"A trial justice's evidentiary rulings are reviewed for an abuse of discretion." *State v. Jaiman*, 850 A.2d 984, 987 (R.I. 2004). Under Rule 801(d)(1)(A)[14] of the Rhode Island Rules of Evidence, "a prior statement of a witness who testifies at the trial or hearing and is subject to cross-examination is *not hearsay* if the statement is inconsistent with the declarant's testimony." *Id.* at 987-88. "For a prior statement to be admitted into evidence under Rule 801(d)(1)(A), 'there must be two statements and each must be sufficiently inconsistent to render the prior statement admissible.'" *Id.* at 988 (quoting *State v. Bettencourt*, 723 A.2d 1101, 1111 (R.I. 1999)). "The determination of whether a pretrial statement is inconsistent with the witness's in-court testimony is within the sound discretion of the trial justice." *Id.* (deletion

---

[14] Rule 801(d) of the Rhode Island Rules of Evidence provides:

> "*Statements Which Are Not Hearsay*. A statement is not hearsay if:
>
> "(1) *Prior Statement by Witness*. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, or (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive, or (C) one of identification of a person made after the declarant perceived the person being identified * * *."

and brackets omitted) (quoting *Bettencourt*, 723 A.2d at 1111). "[U]nlike the federal rule, the inconsistent statement need not have been made while under oath subject to penalty of perjury at a trial, hearing, deposition or other proceeding." *Id.* (quoting Advisory Committee's Notes to Rule 801 at 1052). Thus, "the touchstone of Rule 801(d)(1)(A) is that the witness testify at trial and be available for cross-examination." *Id.*

All agree that Brooks's initial statement—that she called the East Providence Police Department and told them that defendant was "bragging" about his involvement in A'Vant's murder—is not hearsay. In fact, during a colloquy with the trial justice prior to the first trial, Mosley's defense counsel acknowledged that if Brooks "says it here, it's not hearsay." With this threshold statement resolved, our attention turns to the remaining statements—Brooks's subsequent admission to law enforcement that she heard about Mosley's involvement from Suon and then her later statement to prosecutors that she heard about Mosley's involvement from her boyfriend. Contrary to defendant's position, these subsequent statements were admissible prior inconsistent statements, and "not hearsay," pursuant to Rule 801(d)(1)(A).

As this Court has explained, the "justification for the [prior inconsistent statement] rule is that 'the usual dangers of hearsay are largely nonexistent where the witness testifies at trial' because the declarant's availability for

- 54 -

cross-examination allows the adverse party to probe the veracity of the statement * * * and 'puts the trier-of-fact in as good a position to appraise the reliability of the prior statement as it would be if the prior statement were made under oath.'" *Jaiman*, 850 A.2d at 988 (quoting *California v. Green*, 399 U.S. 149, 154-55 (1970) and Advisory Committee's Notes to Rule 801 at 1052).

Here, there is no question that Brooks provided varying iterations concerning the source or basis of knowledge. During defense counsel's extensive cross-examination, Brooks repeatedly acknowledged the inconsistencies with her various statements, and it was within the purview of the jury to assess Brooks's credibility, consistent with the trial justice's instructions on a witness's inconsistent statements, as it deemed appropriate. The trial justice did not abuse his discretion by allowing these statements into evidence.

## I

## Raise-or-Waive Rule

It is well known that "this Court staunchly adheres to the raise or waive rule." *State v. Barros*, 148 A.3d 168, 174 (R.I. 2016) (brackets omitted) (quoting *State v. Figuereo*, 31 A.3d 1283, 1289 (R.I. 2011)). The raise-or-waive rule "should not 'be dismissed as a pettifogging technicality or a trap for the indolent; the rule is founded upon important considerations of fairness, judicial economy, and practical wisdom.'" *Id.* at 175 (quoting *National Association of Social Workers v. Harwood*,

69 F.3d 622, 627 (1st Cir. 1995)). "The rule has 'the salutary effect of making the trial on the merits the "main event," so to speak, rather than a "tryout on the road," for what will later be the determinative' appellate review." *Id.* (deletion omitted) (quoting *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977)).

"As we have said on innumerable occasions, 'a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court.'" *Barros*, 148 A.3d at 172 (quoting *State v. Bido*, 941 A.2d 822, 829 (R.I. 2008)). "[T]o satisfy the strictures of our 'raise-or-waive' rule, an evidentiary objection must be sufficiently focused so as to call the trial justice's attention to the basis for said objection." *Id.* (deletion omitted) (quoting *State v. Diefenderfer*, 970 A.2d 12, 30 (R.I. 2009)). Further, this Court has recognized that "a specific ground for an objection must be stated unless the reason for the objection is clear from the context in which it was made." *Id.* (citing R.I. R. Evid. 103(a)(1)). "[S]imply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue." *Drew v. State*, 198 A.3d 528, 530 (R.I. 2019) (mem.) (brackets omitted) (quoting *Dunn's Corners Fire District v. Westerly Ambulance Corps*, 184 A.3d 230, 235 (R.I. 2018)). Mosley infringes upon these well-settled canons on multiple occasions.

First, Mosley complains that the trial justice erred in disallowing the testimony of defense witnesses Sterling Stevens, Tommy Ngo, Brian Wieczorek, and Melvin Brown. Second, defendant asserts that the trial justice erred in overruling an objection that permitted his Google account to be admitted into evidence. In both situations, defendant's appellate argument is limited to a single undeveloped paragraph, which provides no legal authority and instead merely references the trial justice's decision.

Recently, this Court examined a similar waiver issue and concluded that a defendant's "entire appellate argument [was] to refer this Court to the Superior Court record." *Tavares*, 312 A.3d at 465. Accordingly, we determined that the failure to develop an appellate argument constituted a waiver of that issue on appeal. *Id.* at 465-66. Similarly, Mosley's failure to develop either argument on appeal "does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue." *Drew*, 198 A.3d at 530 (quoting *Dunn's Corners Fire District*, 184 A.3d at 235); *see also Terzian v. Lombardi*, 180 A.3d 555, 557 (R.I. 2018) ("We have consistently made it clear that, under our raise-or-waive rule, 'even when a party has properly preserved its alleged error of law in the lower court, a failure to raise and develop it in its briefs constitutes a waiver of that issue on appeal and in proceedings on remand.'") (brackets omitted) (quoting *McGarry v. Pielech*, 108 A.3d 998, 1005 (R.I. 2015)). Accordingly, we deem both issues waived.

Third, Mosley argues that the trial justice erred when he permitted the state to argue during closing arguments: "Unlike Yusef A'Vant, maybe [Suon] won't get a bullet in the heart if she doesn't cooperate." Fourth, Mosley insists that the trial justice abused his discretion in declaring a mistrial following the first trial when the jury was unable to return a unanimous verdict on counts 1 and 2. According to defendant, the jury was not "genuinely deadlocked" and the trial justice failed to "make a finding the jury was genuinely deadlocked, or consider available alternatives in a balance between Mr. Mosley's rights and the State's interests." Fifth, defendant maintains that the trial justice erred when he denied defendant's "right" to be present at a sidebar during which jury instructions were discussed.

Having diligently inspected the record, we conclude that with respect to the alleged errors set forth in the preceding paragraph, defendant failed to assert an objection at trial. Indeed, before this Court, Mosley does not identify any reference to an objection within the record. While Mosley suggests that the trial justice committed various alleged errors, "to satisfy the strictures of our 'raise-or-waive' rule, an evidentiary objection must be sufficiently focused so as to call the trial justice's attention to the basis for said objection." *Barros*, 148 A.3d at 172 (deletion omitted) (quoting *Diefenderfer*, 970 A.2d at 30). The defendant fails to do so; therefore, consistent with this Court's well-recognized raise-or-waive rule, each allegation is waived.

Sixth, we conclude that defendant's allegation that the state violated Rule 16 when it failed to disclose that Drepaul left the recording device in the bushes for later retrieval by law enforcement officers was not preserved and is otherwise meritless. During direct examination, Drepaul testified concerning the chain of custody of the recording device:

"Q:   And as it relates to that recording device that you talked about, what happened with that?

"A:   I handed it over to them.

"Q:   And they took it from you?

"A:   Yeah.

"Q:   Now, you testified earlier --

"A:   No, I did not hand it to them.  I threw it in the bushes.  That's what happened.

"Q:   You did what?

"A:   I took it off and put it to the side.  When I went back in the house."

Shortly thereafter, testimony ended for the day, without defense counsel raising a Rule 16 objection.  The following day, after testimony resumed, defense counsel requested a sidebar concerning Drepaul's revelation, but again, the objection never raised the specter of a Rule 16 violation:

"[DEFENSE COUNSEL]: * * * I just wanted to make sure the objection -- Mr. Drepaul has disclosed he threw this recording device into bushes.  That's the first time I ever

- 59 -

heard this. It may be somewhere in the record. It hasn't been called to my attention. But the point is, I don't know who received the recording device, if this is the recording device, and I object to it being played.

"[PROSECUTOR]: I heard him say that yesterday for the first I heard of it, too. I think he's mistaken. It's right on the tape in the last page, with the detective saying, I'm recovering the device.

"THE COURT: Well, the tape is what the tape is. Nevertheless, the witness has identified the [recording]. He's identified it as having been an accurate recording of what transpired when he spoke with your client.
        The objection is overruled."

This Court has observed that "[t]he raise-or-waive rule imposes upon litigants a duty to raise all their claims for relief in the trial court and properly articulate them to a judge for a ruling." *State v. Cahill*, 196 A.3d 744, 753 (R.I. 2018) (quoting *State v. Yon*, 161 A.3d 1118, 1128 (R.I. 2017)). "In the context of Rule 16 violations, we have held that a party must 'adequately express its Rule 16-based objection in a manner sufficient to afford the trial justice an opportunity to elicit further information and properly pass on the issue.'" *Id.* at 753-54 (brackets omitted) (quoting *State v. Stierhoff*, 879 A.2d 425, 435 (R.I. 2005)).

Here, based on our inspection of the record, it is apparent that defense counsel never raised a Rule 16 objection, and the trial justice never addressed an alleged Rule 16 violation. Instead, the trial justice based his decision to overrule the

- 60 -

objection on foundation and authenticity grounds.  Accordingly, the defendant's appellate argument is waived.[15]

## Conclusion

For these reasons, the judgment of conviction is affirmed.  The papers in this case are remanded to the Superior Court.  The Superior Court is directed to enter a corrected judgment of conviction forthwith.

---

[15] In any event, later on direct examination, the state clarified Drepaul's prior testimony:

> "Q:  And if you will turn, Mr. Drepaul, to the last page [of the transcript of the recorded conversation], Page 64, is that where you turned the -- or the detective takes the device?
>
> "A:  Yes.
>
> "Q:  I think you mentioned yesterday, something about putting it in a bush, but he did take it from you?
>
> "A:  I took it off -- I gave it to him -- I grabbed it and gave it to him afterward."

In light of this testimony and clarification, it appears that the defendant's allegation of a Rule 16 violation is of no moment.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Thomas Mosley. |
| **Case Number** | No. 2022-13-C.A. (P1/16-2491AG) |
| **Date Opinion Filed** | August 28, 2024 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Virginia M. McGinn<br>Department of Attorney General |
| | For Defendant:<br><br>Jodi M. Gladstone, Esq. |